**UNITED STATES of America**

v.

**Murdo F. MARGESON.**

Crim. No. 65–7.

United States District Court
D. Maine, S. D.

June 3, 1965.

William E. McKinley, U. S. Atty., Portland, Me., for plaintiff.

Manuel Katz, Daniel Klubock, Paul T. Smith, Boston, Mass., for defendant.

GIGNOUX, District Judge.

Defendant Murdo F. Margeson has filed with the Court a motion under Fed. R.Crim.P. 41(e) to suppress for use as evidence and to return to him one pair of black shoes,[1] which he alleges was unlaw-

---

1. The Government has voluntarily agreed to the suppression of the other items of personal property listed in defendant's motion.

fully seized from him by agents of the Federal Bureau of Investigation and the Concord Police Department at Concord, New Hampshire on June 8, 1964. It is undisputed that the shoes were taken from the person of the defendant in connection with his arrest by FBI agents on a charge of robbery of the Mill Creek branch of the Federal Loan and Building Association at South Portland, Maine, on June 5, 1964, in violation of the federal bank robbery statute, 18 U.S.C. § 2113(a). It is also conceded that the arresting officers were not acting pursuant to an arrest warrant and that they had no search warrant. The Government justifies the seizure as reasonably incident to a lawful arrest based upon sufficient probable cause. Ker v. State of California, 374 U.S. 23, 34–37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); cf. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

From the evidence presented to it, the Court finds the circumstances of the defendant's arrest and the subsequent seizure of the shoes involved were as follows. At approximately 2:00 p. m. on Friday, June 5, 1964, two armed men entered the Mill Creek branch of the Federal Loan and Building Association at South Portland, Maine, took money from the tellers' cages and fled. FBI Agent Gibbons arrived at the scene to investigate the robbery shortly thereafter. During the course of his investigation that afternoon he was informed by Mr. Elmer Inman, a supervisory employee of a nearby supermarket, that at about 11:30 o'clock that morning he had observed a green Chevrolet automobile, with two men in it, parked in the parking lot of the shopping center which serves both the supermarket and the bank; that he had observed one of the men get out of the car and walk completely around the supermarket and along the street in front of the bank before he returned to the car; that he thought this was unusual; and that he had noted the registration number of the car, which was New Hampshire registration "MO 998." Upon receipt of this information Gibbons called FBI Agent Roedell in Concord, New Hampshire, who after inquiry reported to Gibbons that the registered owner of the car involved was the defendant Murdo Margeson, of Warner, New Hampshire. Roedell also reported to Gibbons that Margeson was at the time on bail pending his appeal from a bank robbery conviction in Massachusetts.

During the course of his investigation Gibbons also learned that Mr. Richard Morse, the assistant manager of the bank, was the bank employee who had escorted one of the robbers around the bank. Morse described this robber as a white male about six feet tall, weighing about 160 pounds, slimly built, and agile. He stated that the robber was wearing a handkerchief mask, which obscured the lower part of his face, but that he felt he could identify the man if he saw him again because of the distinctive hair growth on the back of his head at the nape of his neck. Morse also reported that this robber had jumped onto the counter in the bank in order to get to the tellers' cages. Gibbons then examined the bank counter and found two shoe prints, of which the heel impressions were particularly discernible and appeared to him to be of an unusual design. Since it was not possible to photograph the heel prints, Gibbons caused a sketch to be made. The section of the counter involved was also physically removed and preserved.

On the evening of the robbery Boston FBI agents showed to Morse and the other bank employees a number of photographs, including photographs of Margeson; these photographs of Margeson bore legends showing that they were taken by the Boston Police Department in 1958, and some of them bore his description. The bank employees were unable to identify either of the robbers

from these photographs, and Gibbons was so informed. On the same evening Roedell informed Gibbons that Margeson's car with two male occupants, one of whom was Margeson, had been observed by Concord police officers at approximately 5:30 p. m. on that day at the Concord traffic circle, proceeding from the direction of Maine toward Warner. Gibbons knew that the distance from South Portland, Maine to the Concord traffic circle was between 100 and 125 miles and the normal driving time was about 1½ to 2 hours.

On Saturday morning, June 6, Gibbons and Morse drove to Concord and contacted Roedell for the purpose of permitting Morse to observe Margeson and if possible, to identify him. Since they were unable to locate Margeson, they returned to Portland that evening. During the course of this trip Morse was again shown photographs of several persons, including Margeson, and was again unable to identify him as one of the robbers. He was also informed at this time that Margeson was the owner of the car which had been seen in the area of the bank on the morning of the robbery.

On the following Monday, June 8, Gibbons and Morse again drove to Concord and contacted Roedell. After lunch Roedell received word that Margeson had left his residence in Warner and was driving his car toward Concord. Gibbons and Morse, in Gibbons' car, followed Roedell, in his car, in the direction of Warner. When they were about half way from Concord to Warner, Roedell observed Margeson driving his car in the opposite direction toward Concord. He radioed this information to Gibbons, who after Margeson's car had passed him executed a U-turn, followed and overtook Margeson's car. As Gibbons was overtaking and passing Margeson's car, Morse was able to observe the back of Margeson's neck, his profile and the general shape of his head and shoulders. He stated to Gibbons that Margeson was the robber whom he had escorted around the bank. Gibbons then stopped to telephone the United States Attorney's office in Port-land to inform the United States Attorney of Morse's identification and to request authority to file a complaint for an arrest warrant, which was granted. He also telephoned the FBI office in Boston, spoke to the assistant agent-in-charge, informed him that a complaint had been authorized, and requested additional help for an arrest. At Gibbons' request, FBI Agents Madden and McCarthy were sent from Nashua, New Hampshire to assist in the arrest.

While Gibbons was telephoning, Roedell continued the surveillance of Margeson. When Gibbons completed his calls, he reestablished radio contact with Roedell and was informed that Margeson's car was then parked on Main Street in Concord. Gibbons and Morse proceeded to Main Street, where Morse was able to observe Margeson walking on the sidewalk. Once again, he stated to Gibbons that he was convinced Margeson was the robber whom he had escorted around the bank. From Main Street the agents and Morse followed Margeson to the parking area of the Capital Shopping Center in Concord, where Margeson parked his car alongside Britts department store and entered the store. When Margeson did not come out of the store, Gibbons became concerned that Margeson might have observed the surveillance of the agents and might have left by another exit. He thereupon radioed the Boston FBI office, spoke to the assistant agent-in-charge and obtained approval of his decision to make an arrest, before any warrant was issued, as soon as the Nashua agents arrived. He then entered the store to look for Margeson.

In the meantime, Roedell, together with Agents Madden and McCarthy and Lieutenant Hines and Detective Joslin of the Concord police department, who had arrived to assist in the arrest, placed themselves in positions where they could observe the store entrances. At approximately 3:30 p. m. Roedell observed Margeson leave the store, get into his car and start to drive from the parking area. Roedell moved his car to intercept Margeson's car; got out of his car; ap-

proached Margeson's car; identified himself as an FBI agent; and told Margeson that he was under arrest in connection with the South Portland bank robbery. He instructed Margeson to get out of his car, which Margeson did. Roedell then "frisked" Margeson for weapons and handcuffed him. As Roedell was making the arrest, the other agents and the Concord police officers arrived at the scene; Roedell left to talk with the owner of another car which he had sideswiped in intercepting Margeson; and Gibbons took charge. He instructed Margeson to sit in the rear seat of the car with Madden; took Margeson's car keys and opened and searched the trunk; but he found nothing of significance. Gibbons then asked Margeson to remove his shoes, which were loafers. He took the shoes from Margeson and examined the heels, noting that they were of the same pattern as the heel prints which he had observed on the bank counter. He also compared the heels with a rough sketch which he had made of the heel prints, which confirmed his recollection. He then stated in Margeson's presence that the shoes were important evidence and that he was seizing them. Gibbons then returned the shoes to Margeson, saying that the officers would let him wear the shoes until they could get him something else to wear. Margeson was permitted to wear the shoes until they were finally taken from him by Agent McCarthy and Lieutenant Hines approximately one hour after Margeson's arrival at the Concord Police Station. Gibbons' purpose in returning the shoes to Margeson was to spare him from having to travel in his stocking feet. Since a crowd was gathering, the agents drove Margeson's car, with Margeson in it, to a more remote section of the parking lot, approximately 200 to 300 feet away, where Gibbons and McCarthy conducted a search of the interior and trunk of the car, but again found nothing of significance. They then drove Margeson to the Concord Police Station, a distance of five or six blocks, where he was held for approximately an hour and a half before being driven to Manchester, New Hampshire for his arraignment before the United States Commissioner.

 Defendant attacks the seizure of the shoes on two grounds. First, he contends that the arrest without warrant was unlawful because at the time of the arrest the arresting officers did not have probable cause to believe that Margeson had committed the crime with which he was charged.[2] The Court must disagree. As recently stated by the Supreme Court in Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), the constitutional validity of an arrest without warrant

> "depends * * * upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the * * * [defendant] had committed * * * an offense." (Citations omitted.)

The facts and circumstances within the knowledge of Agent Gibbons and his fellow arresting officers at the time of Margeson's arrest included the following: (1) information that a car registered in Margeson's name, with two male occupants, had been observed in the area of the bank shortly prior to the rob-

2. The authority of FBI agents to make arrests without a warrant is contained in 18 U.S.C. § 3052, which provides in pertinent part as follows:

> "(A)gents of the Federal Bureau of Investigation * * * may * * * make arrests without warrant * * * for any felony cognizable under the laws of the United States if they have

reasonable grounds to believe that the person to be arrested has committed * * * such felony."

In Henry v. United States, 361 U.S. 98, 100, 80 S.Ct. 168, 225, 4 L.Ed.2d 134 (1959), the Supreme Court equated the statutory standard of reasonable grounds with the constitutional standard of probable cause.

bery; (2) information that Margeson's car, with Margeson and another man in it, had been observed at the Concord traffic circle coming from the direction of Maine at a time which was consistent with the normal travel time from South Portland to Concord; (3) information that Margeson had been convicted of bank robbery in Massachusetts; and (4) the positive identification, with substantial basis, by Morse of Margeson as one of the bank robbers involved. In the view of this Court this knowledge was more than sufficient to warrant the arresting officers in believing that Margeson had committed the offense with which he was charged.[3] His arrest therefore was lawful.[4]

■ Defendant's second contention is that even if the arrest were lawful, the subsequent search of Margeson and the seizure of the shoes were illegal, both because the search was not incidental to the arrest and because the shoes were solely evidentiary material and not a proper subject for seizure. In support of his argument that the seizure of the shoes was not incidental to the arrest defendant, relying on Preston v. United States, supra, argues that the seizure did not take place until the shoes were finally taken from Margeson's person at the Concord Police Station approximately one hour after his arrest. However, the record is clear that at the time of Margeson's arrest in the shopping center parking lot Gibbons examined the shoes and then told him that they were being seized as important evidence. The record is equally clear that when Gibbons returned the shoes to Margeson, he informed Margeson that he was permitting him to wear the shoes only until they could get him something else to wear. Under these circumstances the Court is satisfied that the seizure of the shoes occurred at the time and place of the arrest; it was therefore incidental to the arrest and lawful even under the Preston doctrine, if the rule of that case is applicable to a search of the person.[5]

■■ Defendant's argument that the shoes were not a proper subject for seizure is based upon the rule approved by the Supreme Court in Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947), where the Court recognized

"the distinction between merely evidentiary materials, on the one hand,

3. Defendant correctly points out that all but the last of these items of knowledge were hearsay to Gibbons. However, hearsay may contribute to an agent's determination that he has probable cause and reasonable grounds to make an arrest without a warrant. Draper v. United States, supra; United States v. Heitner, 149 F.2d 105 (2d Cir. 1945) (L. Hand, J.). Furthermore, because the second and third items came from law enforcement officers and because the second item tended to verify the first, Gibbons had a duty to pursue them. Cf. Draper v. United States, supra. In pursuing this information, Gibbons received the positive identification by Morse of Margeson as one of the bank robbers. Aside from verifying the hearsay, this identification alone provided Gibbons with probable cause to make the arrest. Cf. Ker v. State of California, supra. As the Supreme Court said in Brinegar v. United States, 338 U.S. 160, 172, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949), "There was hearsay, but there was much more. Indeed * * * the facts derived from * * * [the

Agent's] personal observations were sufficient in themselves * * *."

4. Defendant's suggestion that the arrest was improper because the decision to arrest was made by the assistant agent-in-charge of the Boston FBI office, who did not have the information available to Gibbons, is not supported by the record. It is clear that at all times Gibbons was in charge of the case and that the decision to arrest, although approved by his superiors, was his.

5. Defendant advances the novel proposition that in order to justify the seizure of the shoes the officers must have had reasonable grounds before their seizure to believe that the shoes seized were the shoes Margeson was wearing at the time of the crime. Since the seizure of the shoes by Gibbons occurred after he had satisfied himself as to the similarity between the heels of the shoes and the heel prints left at the bank, the Court expresses no view as to the soundness of this dubious legal argument.

which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime." (Citations omitted.)

See Abel v. United States, 362 U.S. 217, 234–241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). However, the rule precluding seizure of "merely evidentiary materials" has ever been applied to objects found in a search of the person of the defendant incident to his lawful arrest. It is still the law, as declared by the Supreme Court in Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914) (dictum), that the Government has the right "to search the person of the accused when legally arrested to discover and seize the fruits or *evidences* of crime." (Emphasis added.) Accord, Marron v. United States, 275 U.S. 192, 194, 199, 48 S.Ct. 74, 72 L.Ed. 231 (1927) (semble); Morrison v. United States, 104 U.S.App.D.C. 352, 354, 262 F.2d 449, 451, n. 6 (1958) (dictum); Honig v. United States, 208 F.2d 916, 920, n. 3 (8th Cir. 1953) (dictum); Shettel v. United States, 72 App.D.C. 250, 113 F.2d 34 (1940); Landau v. United States Attorney for So. Dist. of N. Y., 82 F.2d 285, 287 (2d Cir.) (dictum), cert. denied, 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389 (1936); Lefkowitz v. United States Attorney for the So. Dist. of N. Y., 52 F.2d 52, 54 (2d Cir. 1931), aff'd, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); United States v. Kirschenblatt, 16 F.2d 202, 203, 51 A.L.R. 416 (2d Cir. 1926) (Dictum); United States v. Pardo-Bolland, 229 F.Supp. 473, 476–477 (S.D.N.Y.1964); United States v.

Kraus, 270 F. 578, 582 (S.D.N.Y.1921) (L. Hand, J.[6]). Furthermore, the Government's position here is that the shoes involved were used by the defendant in committing the bank robbery for which he was arrested. It seems clear, therefore, that they are not "merely evidentiary materials", but rather that they are "the instrumentalities and means by which * * * [the] crime * * * [was] committed * * *." United States v. Guido, 251 F.2d 1, 3–4 (7th Cir.), cert. denied, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 843 (1958).

For the reasons stated, the Court concludes that the seizure of the shoes in question was legal. Defendant's motion to suppress is therefore denied.

---

6. While a seizure from the person was involved in Grillo v. United States, 336 F.2d 211 (1st Cir. 1964), cert. denied Gorin v. United States, 379 U.S. 971, 85 S.Ct. 669,

13 L.Ed.2d 563 (1965), the Court sustained the seizure on other grounds and did not address itself to this point.