STATE OF NEBRASKA, APPELLEE, v. DAVID L. RICE, APPELLANT.
STATE OF NEBRASKA, APPELLEE, v. EDWARD POINDEXTER, APPELLANT.

199 N. W. 2d 480

Filed July 14, 1972. Nos. 38157, 38188.

Frank B. Morrison, Sr., Thomas M. Kenny, Bennett G. Hornstein, J. Patrick Green, and David L. Herzog, for appellants.

Clarence A. H. Meyer, Attorney General, and Melvin K. Kammerlohr, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

The defendants, David L. Rice and Edward Poindexter, in a joint trial, were convicted by a jury of murder in the first degree in the bombing death on August 17, 1970, of an Omaha police officer, Larry D. Minard, Sr., and the jury fixed the penalty at life imprisonment.

On this appeal assignments of error relate to the following: (1) Denial by the trial court of motions of both defendants to suppress evidence seized in a search at 2816 Parker Street in Omaha on August 22, 1970; (2) denial by the trial court of motions by both defendants to suppress the results of scientific analysis of clothing taken from each of them following their arrests; (3) instructions to the jury; and (4) overruling by the trial court of objections to admission in evidence of seven certain purported newsletters of the United Front Against Fascism and National Committee to Combat Fascism, local militant black organizations, and denial of related motions to strike and for mistrial. Errors also were alleged in connection with instructions related to said exhibits. In a separate pro se brief Poindexter makes an assignment of error that the evidence is insufficient to sustain the verdict.

We will note each of the assignments of error in order in separate parts of this opinion and make such reference to the evidence and other matters as may from time to time be required in consideration of the assignments. We first, however, briefly set forth some of the necessary factual information concerning the death of Officer Minard.

In the early morning hours of August 17, 1970, the police department of the city of Omaha received a telephone call purportedly originating from 2865 Ohio Street, which call represented that cries of a girl or woman screaming for help were coming from a vacant house next door at 2867 Ohio Street. The police dispatcher relayed the information by radio and several patrol cars responded to the call, including that of

Officer Minard. Certain officers, including Minard, entered the house at 2867 Ohio Street and in so doing noticed and stepped over a suitcase lying on its side near the doorway. While a search was being conducted an explosion occurred, killing Minard who was standing near the suitcase and apparently inspecting it visually or otherwise. Other officers were injured by the explosion. Scientific analysis of the debris of the explosion established that the source was dynamite contained within the suitcase. Other evidence supported the conclusion that the suitcase contained a dynamite bomb which had been booby trapped and set to explode when moved. Subsequent intensive investigation by the police department led to the apprehension of Duane Peak, age 15, the acknowledged deliverer and planter of the booby trapped suitcase and maker of the false telephone report of the cries for help at 2867 Ohio Street. Peak testified for the State and the defendants were convicted as the instigators of the crime.

I.

On August 22, 1970, police officers procured a search warrant authorizing the search of 2816 Parker Street, the residence of David L. Rice, and the seizure of: "Dynamite and devices which could be used to construct devices which could cause injury to persons and damage to property." The search was conducted and as a result the following items of property, some of which were introduced into evidence at the trial, were seized: "14 Sticks Dupont Red Cross Extra Strength Dynamite, 40 and 50%. 3 DuPont Elect. Blasting Caps., MS 25, 1 DuPont Elect. Blasting Cap. 3 pcs assorted wire. 1 Marathon #499 RR #6 Volt Battery. 1 pr Homecraft wire dykes. 1 CeeTee Co. Pliers. 1 long nose dyke, made in Japan, orange grips. 2 ⅜ X1X¾ inch permanat magnets." It was the foregoing evidence at which the motions to suppress were directed. Prior to trial a hearing was held on the motions to

suppress, evidence was adduced by all parties, and the trial court denied the motions.

The defendants assert that the search and seizure was in violation of the provisions of the Fourth Amendment to the Constitution of the United States which provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The defendants assert that the affidavit upon which the search warrant was issued was invalid in that it does not meet the standards laid down by the Supreme Court of the United States in Aguilar v. Texas, 378 U. S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723; and Spinelli v. United States, 393 U. S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637. They further contend that evidence seized in the search should have been excluded under the doctrines of Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 84 A. L. R. 2d 933; and Ker v. California, 374 U. S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726.

The affidavit was prepared by one of the officers in charge of the search while 2816 Parker Street was under surveillance by other officers. It was done under the intensive pressure of the extensive investigation following the bombing and during a time when the officers were working 18 hours day after day.

The affidavit is as follows: "The complaint and affidavit of *Sgt. R. Pfeffer and Sgt. Jack Swanson,* on this 22 day of *August 1970,* who being first duly sworn, upon oath says:

"That he has just and reasonable grounds to believe, and does believe that there is concealed or kept as hereinafter described, the following property, to-wit: *Dynamite and devices which could be used to construct devices which could cause injury to persons and dam-*

*age to property. Also illegal weapons which he stated should be used against Police Officers. . . .*

"That said property is concealed or kept in, on, or about the following described place or person, to-wit: *A one story white frame house on Parker Street at 2816, In Omaha Douglas County, Nebraska.*

"That said property is under the control or custody of *David Lewis RICE, Minister of Information, National Committee to Combat Fascism.*

"That the following are the grounds for issuance of a search warrant for said property and the reasons for his belief, to-wit: *David Rice is a known member of the National Committee to Combat Fascism, which advocates the violent killing of Police Officers. A violent killing of a Police Officer occurred, in Omaha and arrests were made from the membership of the NCCF. We have been told in the past that RICE keeps explosives, at his residence, and also illegal weapons, which he has said should be used against Police Officers.*

"A warrant authorizing a night-time search is requested because *Nighttime when information was secured, and the property may be removed.*

"WHEREFORE, he prays that a search warrant may issue according to law."

The confused and confusing state of the law of search and seizure is widely recognized. See concurring opinion of Justice Harlan and dissenting opinion of Justice White in Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564; and Landynski, Fourth Amendment Standards, 45 Conn. B. J. 330. We cite and refer to, on the matter covered in this section of the opinion, only those cases which seem most pertinent.

In Aguilar v. Texas, *supra,* the court held that a search warrant was invalid because of a deficient affidavit where the substance of the affidavit was as follows: " 'Affiants have received reliable information from a credible person and do believe that heroin . . . and other narcotics . . . are being kept at the above

described premises for the purpose of sale and use contrary to the provisions of the law.' " The court held that an affidavit may be based on hearsay, but that the magistrate who was asked to issue the warrant must by the affidavit be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where they were claimed to be and some of the underlying circumstances from which the affiant concluded that the informant was reliable. The affidavit was lacking in these requirements and since it was based solely upon the hearsay testimony of the informant it was invalid. Justice Goldberg, writing for the majority, stated: ". . . when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant, (citing Jones v. United States, 362 U. S. 257, 270, 80 S. Ct. 725, 4 L. Ed. 2d 697, 78 A. L. R. 2d 233), and will sustain the judicial determination so long as 'there was substantial basis for (the magistrate) to conclude that narcotics were probably present . . . .' " Justice Goldberg also quoted from Johnson v. United States, 333 U. S. 10, 13-14, 68 S. Ct. 367, 92 L. Ed. 436, as follows: " 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' "

In Spinelli the defendant was convicted on an interstate gambling charge with the use of evidence seized by virtue of a warrant. The affidavit stated the FBI had " 'been informed by a confidential reliable informant' " that the accused was " 'operating a handbook and

accepting wagers . . . by means of the telephones.' " The affidavit also set forth that the defendant had been under surveillance by the FBI for 5 days, had traveled interstate, and had entered an apartment which had two telephones. It further stated he was a gambler and an associate of gamblers. The affidavit was held defective because it did not include information on reliability as required by Aguilar, and because the information relative to the surveillance was not corroborative but only indicative of acts which might be perfectly innocent. The court said: "The affidavit, then, falls short of the standards set forth in Aguilar, Draper, and our other decisions that give content to the notion of probable cause. In holding as we have done, we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U. S. 89, 96 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 U. S. 300, 311 (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U. S. 102, 108 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U. S. 257, 270-271 (1960)."

The latest case we have found touching the sufficiency of the affidavit is United States v. Harris, 403 U. S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723. That case involved a charge of possessing nontaxpaid liquor. The affidavit, as summarized in the headnotes of the report, stated: ". . . respondent had a reputation with the investigator for over four years as being a trafficker in nontaxpaid distilled spirits; during that time the local constable had located illicit whiskey in an abandoned house under respondent's control; on the date of the affidavit

the affiant had received sworn oral information from a person whom the affiant found to be a prudent person, and who feared for his life should his name be revealed, that the informant had purchased illicit whiskey from the residence described, for a period exceeding two years, most recently within two weeks; that the informant asserted he knew of another person who bought such whiskey from the house within two days; that he had personal knowledge that such whiskey was consumed in a certain outbuilding; and that he had seen respondent go to another nearby outbuilding to obtain whiskey for other persons." Analysis shows the above affidavit contained two things: (1) Alleged factual information from an informer alleged to be "prudent," and (2) the accused had a reputation with the affiant investigator as a "trafficker in nontaxpaid distilled spirits." The affidavit was held sufficient. The court in that case distinguished Aguilar, pointing out that there: ". . . we held that an affidavit based solely on the hearsay report of an unidentified informant must set forth 'some of the underlying circumstances from which the officer concluded that the informant . . . was "credible" or his information "reliable." ' " The court also said: "We cannot conclude that a policeman's knowledge of a suspect's reputation—something that policemen frequently know and a factor that impressed such a 'legal technician' as Mr. Justice Frankfurter—is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely in assessing the reliability of an informant's tip. To the extent that Spinelli prohibits the use of such probative information, it has no support in our prior cases, logic, or experience and we decline to apply it to preclude a magistrate from relying on a law enforcement officer's knowledge of a suspect's reputation."

A reputable legal scholar has stated that Harris "appears to go far in the direction of eroding the force of Aguilar and Spinelli." 45 Conn. B. J., note 51, p. 345.

We now analyze the affidavit here considered in order to determine in the light of the foregoing whether it contains a "sufficient basis for a finding of probable cause" by the magistrate. We conclude it does.

It recites, as we have already noted, that the police department had in the past been informed that Rice kept explosives at his residence and that he had said they should be used against police officers. These allegations standing alone would be insufficient, but they gain force and credibility from the following additional allegations based upon the personal knowledge of the Omaha police department and the affiants: (1) David L. Rice is the Minister of Information, National Committee to Combat Fascism; (2) he is a known member of that organization "which advocates the violent killing of Police Officers"; and (3) the death of a police officer by violence (by means of an explosive booby trap—a fact so notorious at the time in Omaha that even the public had knowledge of it as a fact). That explosives were in fact in the neighborhood was evidenced by their use in the bomb. The facts alleged here over and above the informer's information are much stronger than just the reputation of the suspect which the court found sufficient in Harris.

We call attention to the United States Supreme Court's reference in Spinelli to Draper v. United States, 353 U. S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327, and its approval of that case as viable on "the notion of probable cause." That was a case of arrest upon probable cause without warrant, based upon information from an unidentified informant *whose information was given force by occurrences subsequent to the giving of the information but prior to the arrest.* It is important because the Fourth Amendment by its terms makes no distinction between probable cause for arrest and probable cause for search and seizure. More important, that case permitted proof of probable cause for arrest in search in connection therewith by parole testimony, thus in ef-

fect replacing. the necessity for an affidavit. This in accordance with long-established common law practice. In that case the informer had given a description of the suspect, including the clothing which he was expected to wear, and his luggage, and also information as to the train on which he would probably arrive at the Denver railroad station and that he would have drugs in his possession. The court held that the fact that when the police officer arrived at the Denver railroad station he there saw alighting from the train as predicted by the informant a person who met the description as to physical appearance, attire, and luggage given by the informant, verified and gave credibility to the tip and made the arrest valid. We do not see how, as that case relates to "probable cause," it can be distinguished from the one at hand. Rice' position as an officer and key member of an organization openly advocating the violent killing of police officers and his own known advocacy of this end accompanied by the bombing itself is, in our judgment, far more indicative of probable cause for search than were the circumstances in Draper for arrest, which circumstances, apart from the informant's information in the case, were simply neutral as far as the indication of crime is concerned.

It is worthy of mention that in connection with the search for explosives and devices at 2816 Parker Street under the warrant, there was conducted simultaneously therewith a search for Duane Peak for whom the police department of Omaha had at that time a warrant for arrest on a charge of first degree murder in connection with the death of Officer Minard. At that time the police department had the following additional information as shown by the police reports introduced into evidence at the hearing on the motion to suppress: (1) On the morning of August 22, 1970, Donald W. Peak, brother of Duane Peak, was arrested and after having been given the Miranda warnings, voluntarily made a

statement to the police. This statement (a) directly, clearly, and almost conclusively identified Duane Peak as the person who physically delivered the bomb and placed the entrapping phone call; (b) Donald attributed Duane's acts to his membership in the NCCF (sometimes referred to in the record as Panthers); (c) indicated that the bomb had probably been made by Poindexter as head of the organization; and (d) that Duane had been told by headquarters "to lay low." (2) Item (1) (a) above was corroborated by five other identified persons from whom statements had been taken by the police department. (3) An identified informant, based on his own knowledge, stated that on the day following the bombing, David L. Rice had said, ". . . the action was a week late." The informant interpreted the comment as referring to the bombing. (4) Rice and Poindexter were leaders and organizers of the NCCF. (5) A tape recording of the voice which had made the entrapping phone call was identified as that of Duane Peak. (6) Poindexter had been arrested about 6 · p.m., on August 22, 1970, and declined to talk. (7) Personal knowledge of the police department that Rice had made statements in party newsletters led to the conclusion that he was an outspoken advocate of violence against police officers. (8) There were reports (plural) from individuals (plural) that Rice stored explosives at his home at 2816 Parker Street. (9) Literature had been found at the headquarters of the NCCF containing "directions on how to make bombs."

All of this information was introduced at the hearing on the motion to suppress. Draper v. United States, *supra*, Whiteley v. Warden, 401 U. S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306, and other cases appear to us to support the proposition that the affidavit may be supplemented by testimony of additional evidence known to the police.

While up to this point we have treated the search of 2816 Parker Street as though both defendants had

standing to raise the Fourth Amendment question, it is our specific holding that Poindexter has under the evidence shown no standing to raise the question. He claimed at hearing and trial no interest in either the premises or the property seized such as would give him standing. "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing." Alderman v. United States, 394 U. S. 165, 89 S. Ct. 961, 22 L. Ed. 2d 176. We point out that had Poindexter so chosen he could at the hearing on the order to suppress have testified to such an interest as would have given him standing, and his testimony could not have been used against him at trial. Simmons v. United States, 390 U. S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247.

It is quite clear in this case the officers were doing their very best in good faith to follow the mandates of the Fourth Amendment. At the time the affiants first came to the door at 2816 Parker Street and before they had obtained the warrants, there was no response to their knocks. They could, however, see the television set was on. They concluded someone was there but their requests were being ignored. The fact that the television set was going is verified by police reports of statements of a brother of Rice and a companion who appeared at 2816 Parker Street while the place was under surveillance. These persons explained their appearance by stating they thought the place was being burglarized. This occurrence highlights the possibility of removal of the explosive material. The bombing and the items of information listed (1) through (9) above indicate exigent circumstances which might possibly have justified the search even without a warrant in the light of the highly dangerous nature of the material

and the possibility of continued bombings if the suspected explosives were not seized. Nonetheless the officers took the time to apply for a search warrant even though they might have entered the premises justifiably under the terms of the warrant for the arrest of ·Duane Peak for whom they were also looking at that time.

This opinion should in no wise be interpreted by law enforcement officers as a relaxation by this court of the rules laid down for us in Mapp and Ker. Search pursuant to warrant is to be much preferred to search without warrant, and a warrant should be applied for absent the exceptions applicable to exigent circumstances and other recognized exceptions. Affidavits in support of warrants should be as inclusive, accurate, and complete as is reasonably possible.

## II.

As previously noted, Poindexter was arrested pursuant to warrant on August 22, 1970, and taken to jail. On August 24, 1970, his cothing was taken from him and he was given jail clothing. Shortly thereafter on the same day the clothing was delivered to Treasury Department agents. Following the search of 2816 Parker Street a warrant was issued for the arrest of Rice. He thereafter voluntarily on August 27, 1970, came to the jail, and was placed under arrest. His clothing was also taken from him and shortly thereafter on the same day it was given to Treasury Department agents. In the case of each of the defendants the clothes were taken to Washington, D. 'C., and analyzed by government chemists, and traces of dynamite were discovered. Each defendant moved to suppress the results. The motions were denied.

It is contended that Rice' arrest was illegal because it was based upon an unlawful search of 2816 Parker Street. This contention has already been disposed of. It is also contended that the examination of the clothing was in violation of the Fourth Amendment stand-

ards against unreasonable search and seizure because the search and scientific examination of it subsequent to arrest was not an incident of the arrest, and because there was no search warrant.

Rice relies primarily upon Brett v. United States, 412 F. 2d 401 (5th Cir., 1969). In that case the court, in a two to one decision, held that a search of the suspect's clothing without warrant 3 days after his arrest and the time his clothing was taken from him violated the Fourth Amendment and that the evidence should have been suppressed. No cases of the United States Supreme Court directly applicable are cited. The State relies upon Golliher v. United States, 362 F. 2d 594 (8th Cir., 1966). In that case, the court said: "Subsequent to appellants' arrest, they were relieved of their clothing. The clothing was subjected to scientific tests which disclosed microscopic particles matching particles taken from a bag discovered by officers at the scene of the offense." We are persuaded to follow the decision of the court in Golliher for the reasons which are set forth in the following extracts from that opinion: "The Fourth Amendment does not clearly delineate between searches that are legal and those that are illegal. It only prohibits the unreasonable with each particular case being decided on its own facts and circumstances. Ker v. State of California, 374 U. S. 23, 33, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963); Rios v. United States, 364 U. S. 253, 255, 80 S. Ct. 1431, 4 L. Ed. 2d 1688 (1960); Frank v. State of Maryland, 359 U. S. 360, 79 S. Ct. 804, 3 L. Ed. 2d 877 (1959). Applying this doctrine to an accused we can see nothing unreasonable about seizing from a validly arrested person, evidence that is intimately connected with the crime for which he is arrested. United States ex rel. Boucher v. Reincke, 341 F. 2d 977 (2 Cir. 1965); United States v. Pisano, 193 F. 2d 361 (7 Cir. 1951). In such a situation the accused is already subject to a general search incident to his arrest for such things as weapons, instrumentali-

ties, and fruits of the crime. Therefore, it is not a question of whether or not we shall allow a search, for the search already has the sanction of the law. It is only a question of whether evidence may be seized during the search. Such a seizure of evidence from an accused already in legal custody, therefore, will not generally subject the accused to any burden or indignity that he has not already suffered. The search allowed is limited to objects under the accused's immediate control and only allows seizure of evidentiary matter pertaining to the crime for which the accused was arrested. This carefully circumscribed seizure, limited in space and subject matter, is certainly distinguishable from a general warrant or the general exploratory search of one's personal effects in the sanctity of his home condemned by Gouled and Lefkowitz. As far as an accused is concerned, we do not believe such a seizure is an unreasonable infringement upon his personal rights.

"In making the determination of what searches are reasonable we must also weigh society's interest in continuing to allow such searches. We first note that scientific examination of dust particles, paint chips, blood stains, etc., is a widespread and necessary part of scientific police investigation. Were we to deny enforcement officials the right to gather this evidence from an accused actually in custody, a necessary weapon in the arsenal of detection would be largely destroyed. In recent years the Supreme Court has announced Constitutional principles that necessarily de-emphasize the use of interrogation, and, at the same time, supposedly encourage scientific investigation. Escobedo v. State of Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964); Mallory v. United States, 354 U. S. 449, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 (1957). As a practical matter we cannot possibly insist that enforcement officials rely upon scientific investigation and at the same time deny them an integral part of this scientific

potential. True, we must be diligent in our protection of the basic rights of an accused, but likewise we must not be derelict in protecting society from the ravages of criminal activity. We must be extremely careful not to completely disarm the enforcement officials of the weapons necessary to maintain order, which in turn would leave us all at the mercy of the unhindered criminal. Were we to uphold appellants in this case the bloody shirt worn into the police station by the murder suspect would be kept from the eyes of the jury. To us this would be deplorable folly. Therefore, we do not propose to initiate a rule that would dictate such a patently unjust result. . . .

"Although the Constitutional issue was not raised, we recently approved the seizure of the arrested persons' clothing and the admission of scientific comparison evidence found thereon. McNeely v. United States, 353 F. 2d 913 (1965). Even when presented with the Constitutional issue, all the cases of which we are aware have specifically upheld, on various grounds, the validity of seizing the clothing worn by the arrested individual and subjecting the same to scientific tests later admitted into evidence. Robinson v. United States, 109 U. S. App. D. C. 22, 283 F. 2d 508 (1960) cert. denied 364 U. S. 919, 81 S. Ct. 282, 5 L. Ed. 2d 259; Whalem v. United States, 346 F. 2d 812 (D. C. Cir. en banc 1965) cert. denied 382 U. S. 862, 86 S. Ct. 124, 15 L. Ed. 2d 100; United States v. Guido, 251 F. 2d 1 (7 Cir. 1958) cert. denied 356 U. S. 950, 78 S. Ct. 915, 2 L. Ed. 2d 843; Nelson v. Hancock, 239 F. Supp. 857 (D. N. H. 1965); United States v. Margeson, 246 F. Supp. 219 (D. Me. 1965); State v. Menard, 331 S. W. 2d 521 (Mo. 1960); State v. Phillips, 262 Wis. 303, 55 N. W. 2d 384 (1952); Sheppard v. State, 394 S. W. 2d 624 (Ark. 1965); People v. Shaw. Cal. App., 47 Cal. Rptr. 96 (1965); State v. Post, 255 Iowa 573, 123 N. W. 2d 11 (1963). Because of the reasons stated above, we feel it is imperative that we follow this long list of authority. It is our

conclusion that the clothing of appellants was validly seized as an incident to their lawful arrest and that the admission of the evidence found thereon did not violate their rights under the Fourth or Fifth Amendment."

As to Poindexter, it is further argued that his arrest was unlawful because the warrant for his arrest was issued without probable cause and therefore the seizure or taking of his clothing was likewise unlawful. He relies upon Whiteley v. Warden, 401 U. S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306, decided March 29, 1971, where the Supreme Court of the United States held that a sworn complaint alleging the commission of a crime was not a sufficient basis to issue an arrest warrant and that the judicial officer issuing the warrant must be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant *or* that the officers themselves have acquired additional information which is corroborative of the complicity of the arrestee in the crime.

The factual information in the hands of the police before the search of 2816 Parker Street on August 22, 1970, which we have previously listed, was in their hands before Poindexter's arrest on August 22, 1970, and would justify an arrest of both Poindexter and Rice.

In Whiteley v. Warden, *supra,* the sole basis of the complaint and warrant was the tip of an informer. The law officers had no independent corroborative information. Here the police had additional information which was corroborative of Poindexter's complicity and gave probable cause for his arrest.

The scientific examination of the clothing of the defendants taken from them shortly after their arrest did not violate the Fourth Amendment.

### III.

Duane Peak testified at the trial that he did not intend to kill or maim a police officer and when he left the suitcase at 2867 Ohio Street he did not arm it, but his purpose was merely to frighten the officers; when

they found it in the hope they would then treat black people better. The defendants argue that this would permit the jury to find Duane Peak was guilty of homicide less than first degree murder and that their guilt could be only derivative as alleged accessories before the fact. They argue, therefore, that the following instruction was in error, to wit, "If the intent of the aider is different from that of the perpetrator, the aider's guilt is measured by the intent that actuated him," because under the law the aider cannot be guilty of a crime of greater degree than the principal.

The argument on this point in the brief is well done, but we do not believe it is valid. The evidence was sufficient to establish a common design to commit murder in the first degree. The fact that the evidence would permit the jury to find that Peak had changed his mind as to his purpose and changed his intended actions (which changes if made were never communicated to the defendants) and so to find that he was guilty only of homicide less than first degree would not change the degree of the instigators' guilt if there was the necessary intent and premeditation on their part. See, 40 C. J. S., Homicide, § 9e(3), p. 848; 22 C. J. S., Criminal Law, § 106, p. 297; Red v. State, 39 Tex. Cr. 667, 47 S. W. 1003; State v. Lord, 42 N. M. 638, 84 P. 2d 80; Fleming v. State, 142 Miss. 872, 108 S. 143; People v. Blackwood, 35 Cal. App. 2d 728, 96 P. 2d 982.

Under the Nebraska statute the common law distinction between principal and accessory before the fact, or aider and abettor, has been abolished and the instigator is tried as a principal. § 28-201, R. R. S. 1943. At common law an instigator not personally present at the crime was called a principal in the second degree. In such cases the intent of the instigator governs his degree of guilt. State v. Lord, *supra;* Red v. State, *supra.* The instruction was not in error.

IV.

Both defendants assign as error the admission into

evidence over their objections of certain newsletters of the United Front Against Fascism and the National Committee to Combat Fascism (exhibits 14, 16, 17, 18, 19, 57, and 58). This assignment has several facets pertaining to motions to strike and for mistrial, as well as the claim that the admission of the exhibits is the source of prejudice to the defendants in the denial of the motion of the defendants for separate trials because of the possible use by the jury of statements or articles in the newsletters of one defendant against the other. In connection with the above it is asserted that instruction No. 21 is erroneous because it did not limit consideration of the statements or articles to the issue of intent.

The newsletters contained articles and statements appearing under the separate bylines of Rice and Poindexter, the general nature of which statements or articles, insofar as they are relevant and material, were expressions of hatred for the Omaha police and advocacy of the use of violence, including lethal violence, against them. These newsletters appeared and were publicly circulated during the several months immediately preceding the bombing.

The articles and statements were logically and legally relevant and material as those two terms are used in the law. 31A C. J. S., Evidence, § 158 et seq., p. 426 et seq. Threats and expressions of ill will are in homicide cases admissible to show intent, malice, or motive. Malice and motive are relevant and material not merely as evidence of intent but also on the issue of guilt or innocence as pointing to the identity of the perpetrator or perpetrators. 22A C. J. S., Criminal Law, §§ 607, 614, pp. 414, 422. Threats made by a person against a class are admissible in a prosecution for a crime committed against one of that class. State v. Dockery, 238 N. C. 222, 77 S. E. 2d 664.

The foundation for the admission of the exhibits is sufficient as to each defendant. That the newsletters

were the organs of the UFAF and NCCF is acknowledged by the defendants. The record completely supports the conclusion that the two defendants were among the organizers and key officers of the organization; that they did in fact compose the article appearing above their names; and that they had detailed knowledge of the contents of the newsletters because of their respective parts in the composition, construction, editing, and publishing of the letters including typing, cutting stencils, art work, and distribution. Poindexter denied authorship of one of the articles appearing under his name, but the general method of procedure in publication and the other evidence would support a contrary conclusion by the triers of fact. Both Poindexter and Rice testified on their own behalf and each, of course, was afforded an opportunity to cross-examine the other.

Instruction No. 21 given by the trial court was as follows: "The State has introduced certain news letters into evidence and they have been received as evidence but it has been agreed by the parties that you are to consider as evidence only the articles written and the art work contained therein, that is related to the individual defendants. You may consider the news letters with that limitation in your deliberations." In this connection two claims of error are made. The first relates to the language, "it has been agreed by the parties," and the second with the reference to the words, "related to the individual defendants." With reference to the first, the argument is that since the record contains no evidence of an agreement by the parties this permitted the jury to think the defendants had withdrawn their objections to the exhibits and consented to the jury considering them. In this connection we point out the evidence justified the jury in considering the pertinent articles and art work. Admissibility is a question for the court, not the jury. We can perceive no error on account of the language used even if inaptly chosen.

. With reference to the second claimed error, it would appear that the language, "that is related to the individual defendants," is not as clear as it might have been, but when taken in connection with instructions Nos. 28 and 29, it seems clear to us no prejudice resulted. This portion of the instruction would appear to mean that articles or art work not authored by the defendants were not to be considered. Instruction No. 29 is NJI No. 14.54 which requires the jury to separately consider the guilt or innocence of each defendant and to consider against each defendant only the evidence which applies to him. Instruction No. 28 is in part as follows: "You are instructed that where the evidence shows a common plan, arrangement or design between two or more persons, evidence as to an act done or a statement made by one is admissible against all, provided the act be knowingly done and the statement be knowingly made during the continuance of the arrangement between them, and in furtherance of an object or purpose of the common plan or arrangement." This instruction also left to the jury the determination whether there was a common plan or design to commit the crime. Instruction No. 28 is of course correct. State v. Watson, 182 Neb. 692, 157 N. W. 2d 156. Instructions must be considered as a whole, and when so considered and they fairly reflect the law, there is no error.

In connection with the claimed error as to instruction No. 21 and the failure of the trial court to grant the motion for separate trials, the defendants rely upon Bruton v. United States, 391 U. S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476. The principles of this case appear not to be applicable because as we have noted each defendant testified and was subject to cross-examination by the other. In Bruton one defendant did not testify and his confession or admissions implicating his codefendant were used against said codefendant. This the court held was a denial of the constitutional right to confrontation and could not be cured by a cautionary

instruction. Bruton by its terms appears to apply only to confessions and admissions by one codefendant when used against the other. In this case there was no denial of the constitutional right to confrontation and cross-examination. Also the articles authored by each do not by their contents implicate the other.

One article in one of the exhibits is purportedly jointly authored by both defendants and as to this what we have said in the fourth preceding paragraph is applicable. The jury would be justified from the evidence in finding that it was in fact jointly authored by the two defendants.

There was no error in denying the motion to sever. See, A. B. A. Standards Relating to Joinder and Severance, Approved Draft, 1968, Standard 1.2(a), p. 5, and commentary, p. 14, and Standard 2.2, p. 7, and commentary, p. 29; § 29-2002, R. R. S. 1943. We recognize, of course, that some Nebraska cases may no longer be viable in the light of Bruton v. United States, *supra*, where an out-of-court admission or confession by one defendant is being used against the other without right of confrontation and cross-examination.

The newsletters themselves contain much that is irrelevant and of that most is wholly and simply irrelevant and could not support any claim it was prejudicial. The court when it admitted the newsletters into evidence indicated that irrelevant material and inadmissible items would be excised before being shown to the jury. It appears this was not done. We are therefore called upon to consider the question whether the admission of some of these items through apparent oversight constituted prejudicial error requiring a reversal and new trial.

The most prejudicial articles and the relevant and material articles are those purportedly authored by the defendants, and dealt with hate of the police and the advocacy of violence against them.

Some examples of the irrelevant material purportedly

authored by one or the other of the defendants or by others and which are at least arguably prejudicial are the following: (1) An article purportedly written by Rice attacking racism at North High School and suggesting that if the racists did not understand the logic of words, ". . . maybe they will understand the logic of not having a house or having a burning car." (2) Unsigned articles advocating overthrow of the government. (3) Disclosure of a purported plan by the United States, called the "King Alfred Plan," to use racial unrest as an excuse for a racial war and internment in the concentration camps of racial minorities. The admission of such items into evidence was clearly error and had no place in the trial of these cases.

In determining whether or not this constituted prejudicial error we consider the following: (1) The fact that the relevant and material and admissible articles purportedly authored by the defendants were of a far more virulent and prejudicial nature than any of those erroneously admitted. (2) The strength of the evidence of guilt. About this more will be said when we consider the assignment related to the sufficiency of the evidence to sustain the verdict. (3) The cautionary instructions, No. 21 and No. 28, given to the jury. (4) The great unlikelihood the jury would base its finding of guilt and consequently impose a sentence of life imprisonment upon matters which were not indicative of the guilt of the defendants of the particular crime with which they were charged.

It seems unlikely to us that the admission of the irrelevant statements reaches the dimension of the constitutional error, but nonetheless in accordance with the standards declared by the Supreme Court of the United States in Chapman v. California, 386 U. S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, 24 A. L. R. 3d 1065, we have concluded the error was harmless beyond a reasonable doubt. In so doing we have applied the same standard of reasonable doubt that this court has ap-

proved as being applicable to the burden of proof of guilt in criminal prosecutions. NJI No. 14.08. This standard seems to conform to and be compatible with that announced in Chapman. We conclude that there is no reasonable possibility of prejudice on account of the failure to delete the irrelevant portions of the newsletters. We have an abiding conviction to a moral certainty that the jury would have convicted Rice irrespective of the irrelevant statement attributed to him and which we have specifically mentioned. The possibility of prejudice to Poindexter is even more remote.

### V.

We now turn to the final assignment of error made by Poindexter that the evidence was insufficient to sustain the verdicts. The assignment is not well taken and we substantiate this by very brief résumé of the trial evidence as it pertains to the two defendants, omitting evidence of motive and identity contained in the newsletters and which has been already adequately covered, but will again refer to the finding of the physical evidence in Rice' residence.

Duane Peak, the actual perpetrator of the crime, testified for the State. His testimony would permit the jury to find that the following is true. Peak joined the NCCF in November 1969, the headquarters of which at that time were 2 blocks from 2816 Parker Street. He participated in the activities of the organization until the time he went into hiding on August 17, 1970. His activities included writing for the newspaper, observing its making, selling newspapers, and serving as desk officer. He was well acquainted with Rice and Poindexter, knew their positions in the organizations, and knew their activities.

On August 10, 1967, Poindexter talked to Peak about making a bomb and told him, ". . . he had a beautiful plan to blow up a pig," meaning a policeman. They made arrangements that night to meet at the home of one of the members of the NCCF which they did

and then went to Rice' home. Peak then went with another member and obtained a suitcase which he took to Rice' house through the alley and back door where he was met by Rice and Poindexter. Inside they opened the suitcase. It contained a large quantity of dynamite. Poindexter furnished Peak with plastic gloves and the two of them removed part of the dynamite from the suitcase and placed it in a box which Rice took to the basement. Poindexter then made the bomb in the suitcase using the remaining dynamite and other materials. This was done in the presence of Peak and Rice. Rice furnished tools used in the manufacture. Peak identified the dynamite and the box found in the search at 2816 Parker Street. He identified the tools furnished by Rice. After the bomb had been manufactured inside the suitcase the lid of the suitcase was closed, locked, and put in Rice' bedroom. The following night Peak and Poindexter went to look at the vacant house at 2867 Ohio Street.

On the evening of August 16, 1970, Peak obtained the suitcase from Rice' home pursuant to arrangements which he had made with Rice a short time earlier. At the time he obtained it, Rice gave him tacks which Peak needed to fasten wires projecting through a hole in the suitcase so that the bomb would detonate when the suitcase was moved.

Peak described the route he took and delivery of the bomb to 2867 Ohio Street and his testimony is corroborated by several witnesses. He then made the 911 telephone call from a phone booth at 24th and Grace Streets and gave the operator the story of the woman's screaming at 2867 Ohio Street. Poindexter had earlier told him to do this. Peak was arrested on August 28, 1970.

In addition to the physical evidence found in the search of August 22, 1970, at 2816 Parker Street, Peak's testimony is corroborated by the following. Scientific examination of fragments gathered at 2867 Ohio Street

established the probable cause of the explosion. Scientific examination of a jacket taken from Poindexter disclosed particles of ammonia dynamite which is the type used in the bomb and the type found in Rice' basement. Like particles were found on Rice' pants. Scientific testimony indicated that Rice' pliers had been used to cut a bit of copper wire like that used in the bomb and found in the basement of 2865 Ohio Street, next door to 2867, where the wire had apparently been blown by the force of the explosion which essentially destroyed the house at 2867 and badly damaged that at 2865.

Both Poindexter and Rice were able to establish rather conclusively their whereabouts on the night of August 16-17, 1970, during the hours when the bomb was being planted and when the explosion occurred.

They denied the making of the bomb on August 10, 1970, or being with Peak at that time. Rice denied that Peak was at his home on the evening of August 16. Both denied any part in the making of the bomb, the bombing, or participating in any plan to commit the crime.

Questions of credibility are of course for the jury and not for the court. The evidence was clearly more than sufficient to support the verdict.

Since there was no reversible error the verdicts in both cases No. 38157 and No. 38188 are affirmed.

AFFIRMED.

SMITH, J., concurs in result.

McCOWN, J., concurring in result.

I cannot agree that the affidavit involved here met standards previously applicable. The United States Supreme Court and this court have uniformly held that where informants are involved, an affidavit for a search warrant must inform the magistrate of (1) some of the underlying circumstances from which the informant concluded that the articles were located where he claimed they were; and (2) some of the underlying circumstances from which the officer concluded that the in-

formant was credible. See, United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684; State v. Holloway, 187 Neb. 1, 187 N. W. 2d 85; State v. LeDent, 185 Neb. 380, 176 N. W. 2d 21.

The majority opinion concedes that recitals in the affidavit that the police had been informed explosives were kept at the residence and defendants had said that explosives should be used against police officers would be insufficient standing alone. The opinion nevertheless validates an otherwise insufficient affidavit upon the theory that allegations of membership in a certain organization and the holding of office in such organization, together with an allegation the defendants advocated violence against police officers and that violence had occurred, somehow constitute "underlying circumstances" and cure the otherwise obvious defects. Whenever active membership in an organization which advocates violence against the police or any other group or segment of society, and a public expression of individual approval of such views, standing alone, become justification for the issuance of a search warrant whenever an incident of such violence occurs, the Fourth Amendment has lost its meaning.

I would place the decision on a different ground. At the time of making the affidavit for the search warrant, the police department had ample information to constitute probable cause for the issuance of the warrant, but much of the information was omitted from the affidavit. To apply the exclusionary rule under such circumstances exalts form over substance. Our cases should be modified to permit supplementing the affidavit at the hearing on a motion to suppress by evidence of additional information proven to have been known to the police at the time the affidavit was made and the warrant issued, but not set out in the affidavit. The facts here indicate the advisability of an ad hoc approach permitting some flexibility in the court's analysis of the individual circumstances of each case.