Edward **POINDEXTER**, Petitioner,

v.

**Charles L. WOLFF, Jr., as Warden of the Nebraska Penal and Correctional Complex, Respondent.**

**No. CV74–L–7.**

United States District Court,
D. Nebraska.

Nov. 4, 1975.

724

---

Alan Saltzman, Lincoln, Neb., for petitioner.

Mel Kammerlohr, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

Edward Poindexter, an inmate in the Nebraska Penal and Correctional Complex, has petitioned for a writ of habeas corpus. In response to that petition this court on May 2, 1975, conducted an evidentiary hearing to determine (1) whether the petitioner has standing to contest the search of David Rice's house on August 22, 1970; (2) if such standing exists, whether the decision in *Rice v. Wolff*, 388 F.Supp. 185 (U.S.D.C. Neb.1974), affirmed 513 F.2d 1280 (8th Cir. 1975), cert. granted 422 U.S. 1055, 95 S.Ct. 2677, 45 L.Ed.2d 707 (1975), is binding on all parties and collaterally estops them from presenting additional evidence about the constitutionality of the search in question; (3) whether the police had probable cause to arrest the petitioner and thereafter to search his clothing; and (4) whether the petitioner's due process rights were violated at his trial through the introduction of insufficient, coerced, and unduly prejudicial evidence and the denial of his request for a separate trial.

The circumstances of the arrest and conviction of this petitioner have been recited in *Rice v. Wolff*, supra, and need no extensive recounting. Edward Poindexter was arrested on August 22, 1970, on charges of conspiracy to murder a police officer, Larry D. Minard, Sr. Officer Minard was killed on August 17, 1970, while examining a suitcase at 2865 Ohio Street in Omaha, Nebraska, where he had gone in response to a telephone call. The suitcase, which contained dynamite and was constructed to explode when moved, was activated, and the explosion killed Officer Minard. The Omaha police department's ensuing investigation led them to suspect that members of the National Committee to Combat Fascism (hereinafter referred to as the NCCF) had planted the bomb. Shortly after Poindexter was first arrested, his clothes were searched and dynamite particles were found which were similar to those used in the suitcase bomb. Poindexter later was convicted in the courts of Nebraska for the first degree murder of Officer Minard.

## I.

### STANDING TO CONTEST SEARCH

In *Rice v. Wolff*, 388 F.Supp. 185 (U.S.D.C.Neb.1974), affirmed 513 F.2d 1280 (C.A. 8th Cir. 1975), cert. granted 422 U.S. 1055, 95 S.Ct. 2677, 45 L.Ed.2d 707 (1975), this court held that the search of David Rice's home on August 22, 1970, was unconstitutional and that all evidence seized pursuant to that search should have been suppressed at Rice's trial. Because of the use of this evidence at the state court trial, this court ordered that Rice be released or retried. Rice and Poindexter were tried together in the state court. Poindexter now alleges that he was prejudiced by the use against him of the same evidence illegally seized from the Rice house. In a memorandum opinion of April 30, 1975, I ruled that the mere fact that Poindexter and Rice were tried together does not bestow upon Poindexter standing to contest the search of the

Rice home. Whether Edward Poindexter has the required standing will be considered, therefore, on factors beyond his codefendant status.

A point of embarkation is the following language in *Spinelli v. United States,* 393 U.S. 410, p. 412, 89 S.Ct. 584, p. 587, 21 L.Ed.2d 637 (1968), footnote 2, p. 412:

> "We agree with the Court of Appeals that Spinelli has standing to raise his Fourth Amendment claim. The issue arises because at the time the FBI searched the apartment in which Spinelli was alleged to be conducting his bookmaking operation, the petitioner was not on the premises. Instead, the agents did not execute their search warrant until Spinelli was seen to leave the apartment, lock the door, and enter the hallway. At that point, petitioner was arrested, the key to the apartment was demanded of him, and the search commenced. Since petitioner would plainly have standing if he had been arrested inside the apartment, *Jones v. United States,* 362 U.S. 257, 267 [80 S.Ct. 725, 734, 4 L.Ed.2d 697] (1960), it cannot matter that the agents preferred to delay the arrest until petitioner stepped into the hallway—especially when the FBI only managed to gain entry into the apartment by requiring petitioner to surrender his key."

In *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1967), the United States Supreme Court stated:

> "Furthermore, the Amendment does not shield only those who have title to the searched premises. It was settled even before our decision in *Jones v. United States,* 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697], that one with a possessory interest in the premises might have standing. . . . In *Jones,* even that requirement was loosened, and we held that 'anyone legitimately on premises where a search occurs may challenge its legality . . . when its fruits are proposed

to be used against him.' 362 U.S., at 267 [80 S.Ct. 725 at 734]. The Court's recent decision in *Katz v. United States,* 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] also makes it clear that capacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion. . . ."

392 U.S. at 367–68, 88 S.Ct. at 2123. In *Mancusi* the Supreme Court held that the petitioner had standing to contest the seizure of certain records where the search took place in the petitioner's office, even though it was not a private office but was a single room shared by several. The petitioner spent a "considerable amount of time" in the office and had custody of the documents at the time of their seizure. Although the petitioner did not claim that the documents were seized in an area especially reserved for his use, the court held that it was still proper to confer standing upon him. DeForte could "reasonably have expected that only those persons [office personnel] and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups." 392 U.S. at 369, 88 S.Ct. at 2124. While DeForte had little expectation of absolute privacy, he did have a reasonable expectation of freedom from governmental intrusion and that expectation supplied sufficient standing for him to contest the search.

A more recent discussion of standing is in *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). There the Supreme Court held that the petitioners had no standing to contest the search and seizure of a codefendant's store because they:

> ". . . (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not

charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. . . ."

411 U.S. at 229, 93 S.Ct. at 1569.

Given *Spinelli, Mancusi* and *Brown* as guideposts, I must require that Poindexter persuade me that he, as distinguished from Rice, had a reasonable expectation of freedom from governmental intrusion into Rice's home.

Poindexter was in the custody of the Omaha police department at the time of the search of David Rice's house. He was not on the Rice premises at the time of the search and had not immediately departed from them. His conviction was not of an offense which included possession of dynamite as a necessary element of that offense. Therefore, any reasonable expectation of his to be free of governmental intrusion at Rice's house must emanate from a relationship, akin to a property interest, which he had with the Rice house or the seized property at the time of the search.

The testimony before this court with regard to the petitioner's interest in the Rice home leads to the following findings of fact:

Poindexter spent most of his days during the several weeks before his arrest at the NCCF headquarters, which was at 3508 North 24th, and most of his nights at the NCCF headquarters or at his mother's home at 3415 North 25th and his mother's home was his mailing address; Poindexter during the several weeks before the search was a frequent visitor to the Rice residence, 2816 Parker, sometimes visiting two or three times a day and sometimes not at all for several days; on those occasions when he gained access to the Rice house when Rice was not present he asked Rice for a key and Rice either handed him one or left one for him at NCCF headquarters or on a ledge or under the door mat at the Rice house; Poindexter had musical records and some

items of clothing at the Rice house because he liked to go there to relax and sometimes exchanged clothing with one or two others who also did not live at the Rice house but who also sometimes left clothing there; and Poindexter was at the Rice house on August 22, 1970, at some time before his arrest for the purpose of dropping off some food that had been left over from a conference at NCCF headquarters and gained entrance to the Rice house on that occasion by finding a key on the ledge at the door, although Rice was out of town.

The petitioner also testified that David Rice had said that he, Poindexter, could use the house whenever he wished, but in view of the other testimony it is apparent that Poindexter did not accept any statement Rice made to him as giving him any special right or privilege as to Rice's house. The statement, if made, was a friendly gesture and nothing more.

▮ With these facts before it, it is the opinion of this court that Edward Poindexter does not possess the requisite standing to contest the search of David Rice's house. The petitioner was not on the premises at the time of the contested search. He was neither living there nor spending more than incidental periods of time there. He did not possess a key to the Rice home and almost always sought out Rice for permission to enter the premises. The Rice home was not the business center for the NCCF, of which Poindexter was the principal officer, and the house was not freely accessible to the petitioner without Rice's permission. He has never claimed any interest in the goods seized in the search, even though such a claim could have been made under *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), without any incriminating effect. Therefore, he has no standing to challenge the search. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). See also *Alderman v. United States,* 394 U.S. 165, 89 S.Ct.

961, 22 L.Ed.2d 176 (1969); *United States v. Cohen,* 516 F.2d 1358 (C.A. 8th Cir. 1975); *United States v. Colacurcio,* 499 F.2d 1401 (C.A. 9th Cir. 1974); *United States v. Heisman,* 503 F.2d 1284 (C.A. 8th Cir. 1974); *United States v. Hutchinson,* 488 F.2d 484 (C.A. 8th Cir. 1973).

The facts of this case distinguish it from *Spinelli v. United States,* supra, wherein the defendant had a key to the apartment and his arrest and subsequent search took place immediately outside the building from which the defendant had just exited, and from *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), wherein the defendant was given a key to his aunt's hotel room, was told that he could use the room at will, and wherein the defendant claimed possession of the seized goods. None of these conditions was true as to Poindexter.

## II.

### COLLATERAL ESTOPPEL

Because Edward Poindexter has no standing to contest the search of David Rice's home, it is not in the interest of judicial economy to consider whether this court's decision in *Rice v. Wolff,* supra, is applicable to this case. The issue, therefore, will not be considered.

## III.

### CONSTITUTIONALITY OF THE ARREST

Necessity of examining the propriety of the petitioner's arrest on August 22, 1970, arises from the fact that incident to that arrest some of his clothes were taken from him at the Douglas County jail and dynamite particles similar to the type used in the bombing incident were extracted from the clothing. The particles were received in evidence against him at his murder trial.

■ The arrest was on a warrant, which is now challenged, charging conspiracy to commit first degree murder.

It was issued by the Honorable Jay Gibbs, Judge of the Municipal Court of Omaha, Nebraska, sometime during the afternoon of August 22, 1970, on the strength of a complaint prepared and delivered by Samuel W. Cooper, Deputy County Attorney for Douglas County, and some supplementary information imparted to the judge by Cooper. Neither the complaint nor the arrest warrant was ever filed in the Municipal Court and both were destroyed or lost by an employee of the Douglas County Attorney's office. Validity of the warrant must be examined, therefore, without the benefit of the warrant or the complaint, and only the information actually presented to the issuing judge can be considered in deciding whether the warrant was issued on probable cause as required by the Fourth and Fourteenth Amendments to the Constitution of the United States. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Rice v. Wolff,* 513 F.2d 1280 (C.A. 8th Cir. 1975).

■ Sketchy evidence is all that is available as to what information was presented to Judge Gibbs and it comes entirely from the deposition of Samuel W. Cooper. I conclude that no more than the following facts were presented to Judge Gibbs:

1. That the complaint and requested warrant were in connection with the Minard killing;

2. That various persons had been and were being interviewed at the police station who had implicated Poindexter (no details were stated);

3. That the complaint charged that Poindexter had conspired to commit first degree murder.

These facts were inadequate to permit a judge to make a detached and independent finding that there was probable cause to believe that Poindexter had committed the offense charged. See

*Rice v. Wolff,* 513 F.2d 1280 (C.A. 8th Cir. 1975).

█ Nonetheless, I am persuaded that the arrest was valid as one made without a warrant. If the officers had made the arrest in the absence of a warrant, knowing exactly what they knew when they made the arrest after issuance of the warrant, and if what they knew was enough to support an independent judgment of a reasonable person that there was probable cause to believe that Poindexter was guilty of conspiracy to commit first degree murder, then the arrest was valid. The probable cause standards in this setting must be at least as stringent as in the setting of testing validity of arrest and search warrants. *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

█ Furthermore, it is the collective knowledge of the police force, not merely the personal knowledge of the arresting officers, that is to be used. *United States v. Wixom,* 460 F.2d 206 (C.A. 8th Cir. 1972); *United States v. Canieso,* 470 F.2d 1224 (C.A. 2nd Cir. 1972), fn. 7 and cases cited there. Some communication, however, needs to have been had between the officers having the actual knowledge, including awareness of the hearsay information, and the arresting officers before the arrest. *United States v. Nieto,* 510 F.2d 1118 (C.A. 5th Cir. 1975); *United States v. Del Porte,* 357 F.Supp. 969 (U.S.D.C.S.D.N.Y. 1973), affirmed 483 F.2d 1399 (C.A. 2nd Cir. 1973).

█ There was communication. The arresting officers—Nepodal and Schuemann—were informed of the existence of the warrant for Poindexter. That is enough.

At the time of Poindexter's arrest at approximately 5:55 p. m. on August 22, 1970 (plaintiff's exhibit 26), as well as at the time of the issuance of the arrest warrant sometime in the afternoon of that same day, the Omaha police department collectively knew:

1. That Officer Minard had been killed by the explosion of a suitcase bomb at approximately 2:15 a. m. on August 17, 1970, at 2865 Ohio, Omaha, Nebraska, where he had gone in response to a telephone call;

2. That Donald Peak had stated to police that on the evening of August 16, 1970, Donald Peak's brother, Duane, age 15, a member of the Black Panther Party, was seen by Donald Peak at the Olivia Norris home at 2906 Lathrop in Omaha talking on the telephone and as Donald Peak approached, Duane Peak made a quick gesture with his hands for Donald Peak not to come close to the suitcase or pushed Donald Peak back, and said that he, Duane, was transporting the suitcase for somebody in the Black Panther Party; that later that evening Duane Peak left with the suitcase in the company of Donald Peak and others; that Donald Peak was drunk and fell asleep at the Peak residence about 9:15 p. m. and awakened at about 4:00 a. m. the next morning, August 17, whereupon Duane Peak told him that at exactly 2:15 a. m. a "pig" had been killed and that the suitcase had contained dynamite; that Donald Peak had belonged to the Black Panthers for two or three months but had quit in July, 1970; that after that conversation with Duane Peak of August 17, Duane Peak had taken him to the Party and "the people down there" told Donald Peak to stay off the street; that Duane Peak had been told by headquarters of the Party to "lay low" after the bombing and he was doing so; that Donald Peak, when he was a member of the Black Panth-

er Party, saw Poindexter having some papers on how to make a bomb; that Donald Peak thought the only person who knew how to make a bomb was Poindexter; that he did not know whose idea it was to plant the bomb or who made the phone call to the police but that "to his knowledge it was Poindexter . . . who made the bomb;" and that Poindexter was the head of the Black Panthers and gives the orders (plaintiff's exhibits 22, 23, 6);

3. That Poindexter, among others, had written articles and made speeches advocating violence against police officers (plaintiff's exhibit 6, p. 11);

4. That the NCCF was also known as the Black Panther Party;

5. That a different member of the NCCF, Edward Brightman, within a month earlier, had been tried for assault of a police officer with a deadly weapon (plaintiff's exhibit 6, pp. 10–11);

6. That John Daniel Jerks and Margaret Louise White had stated to the police that on August 16, 1970, they saw Duane Peak at Olivia Norris' home at 2906 Lathrop, carrying in a careful manner a suitcase, grey in color, medium size, which appeared to be too heavy to contain only clothes; that they saw Donald Peak at the Norris home while Duane was there; that they saw Duane Peak and Donald Peak leave the Norris house with others about 9:00 or 10:00 p. m., at which time Duane Peak was carrying the suitcase; that at about 11:30 p. m. they saw Duane Peak at the Norris house but he did not have the suitcase with him; and that within a few days after the bombing Duane Peak had said he had to lay low because the police were looking for him on account of the bombing (plaintiff's exhibits 20, 21);

7. That John Daniel Jerks had told the police that when Duane and Donald Peak were with the Black Panthers, Duane "used to talk about" the making of bombs, and "he talked like they had everything at the Black Panther house" (plaintiff's exhibit 20);

8. That Annie Lee Norris had told the police that on August 16, 1970, Duane Peak came to her home at 2906 Lathrop at perhaps 9:00 p. m., carrying a grey suitcase which he set down in front of him, and on her trying to pick it up he yelled at her not to shake it or touch it but that she did lift it and found it too heavy; that Donald Peak came to her house and had been drinking and left with Duane Peak; that a couple of hours later Duane Peak returned without the suitcase and stayed until between midnight and 1:00 a. m.; that shortly before he left he asked to use the telephone and did talk to somebody on the telephone; and that Duane Peak asked someone either the night before the bombing or the night after whether he or she knew the phone number of the police station (plaintiff's exhibit 19);

■■ Considering the statements of Donald Peak to be those of an informant, they must be tested by *Aguilar v. Texas,* supra; *United States v. Spinelli,* supra; *United States v. Harris,* 403 U. S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); and *Whiteley v. Warden,* supra. *Aguilar,* interpreted in a police, rather than magistrate, context requires that the police have information of "some of the underlying circumstances from which the informant concluded that the [facts] were [as] he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.'" 378 U.S. at 114, 84 S.Ct. at 1514.

The underlying circumstances recounted by Donald Peak against the background of Minard's having been killed by a suitcase bomb were several—Poindexter's chief officership in the NCCF, Poindexter's having papers within the past few months on how to construct a bomb, Duane Peak's carrying a suitcase the evening before the bombing which he later admitted contained dynamite, Duane Peak's membership in the NCCF, Donald Peak's past membership in the NCCF, NCCF's telling the Peaks after the bombing to "lay low," and Donald Peak's knowing nobody else in the NCCF who knew enough to construct a bomb. While these circumstances might not be enough to convince anyone of guilt beyond a reasonable doubt, they surround Donald Peak's opinion that Poindexter had made the bomb with more than bare rumor or fantasy.

Whether Donald Peak was credible was open to question, because he may have been trying to clear himself of suspicion by implicating others. On the other hand, the person he was most heavily implicating was his own brother, who, the police had reason to believe from information supplied by others, was close to and friendly with Donald Peak. Nothing suggests that pointing at Poindexter would reduce his brother's culpability.

Additionally, much of the information given by Donald Peak had been corroborated by John Daniel Jerks, Margaret Louise White, and Annie Lee Norris by the time Poindexter was arrested. Although their corroboration was not of Poindexter's complicity, but of the details of Duane Peak's participation, that did much to establish Donald Peak as a credible person.

I conclude that the standard established by *Aguilar, Spinelli, Harris* and *Whiteley* have been met. See also *United States v. Marchildon*, 519 F.2d 337 (C.A. 8th Cir. 1975).

Mr. Justice Rutledge in *Brinegar v. United States,* 338 U.S. 160, 175–6, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), set the tone for judging whether probable cause exists:

"In dealing with probable cause, however, . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' . . . And this 'means less than evidence which would justify condemnation' or conviction, . . . Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. . . .

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. . . ."

■ When the totality of the information possessed by the Omaha police department before the arrest is placed on the scales, it is enough, it seems to me, to tip them beyond suspicion to the

point of probability of guilt of Edward Poindexter in conspiring to murder a police officer. That means that the arrest was valid, that the seizing of the dynamite particles from Poindexter's clothing as a result of that arrest was proper (*United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974)), and the use of the particles as evidence was not prohibited by the Constitution.

## IV.

### EVIDENCE OF CERTAIN WRITINGS

The petitioner argues that various "inflammatory" writings of David Rice and others were erroneously introduced against him during his state court proceedings. In his brief the petitioner argues that "four articles, bearing Mr. Poindexter's type-written name but never authenticated as his work, fifteen articles bearing Mr. Rice's name and many other items completely unconnected with Mr. Poindexter, were all admitted against Mr. Poindexter." The petitioner further points out that although these documents were to be given the jury after the irrelevant portions were extricated, no such deletions were ever made.

■■■ While this court is not certain of the specific exhibits the petitioner is objecting to, the law on the admissibility of state court evidence is clear. Federal courts do not generally review the propriety of state court evidentiary rulings. Federal courts should intervene only where the admission of evidence is so prejudicial as to constitute a violation of due process. *Cunha v. Brewer*, 511 F.2d 894 (C.A. 8th Cir. 1975); *Parker v. Swenson*, 459 F.2d 164 (C.A. 8th Cir. 1972), cert. denied 409 U.S. 1126, 93 S. Ct. 943, 35 L.Ed.2d 258 (1973); *Taylor v. Minnesota*, 466 F.2d 1119 (C.A. 8th Cir. 1972), cert. denied 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973). The Supreme Court of Nebraska in *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972), did not rule that all of the newspaper articles admitted against the two defendants were admitted erroneously but rather that those newspaper articles which were irrelevant—i. e., those articles attacking racism at North High School, the unsigned articles advocating the overthrow of the government, and those disclosing the "King Alfred Plan" —were erroneously admitted. It was, however, harmless error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in the mind of the Supreme Court of Nebraska. The evidence, in my view, was not so prejudicial as to amount to a denial of due process.

## V.

### REQUEST FOR SEPARATE TRIAL

The petitioner argues that he should have been tried apart from David Rice and that the refusal of the trial court to so rule was constitutional error.

■■■ A trial court possesses great discretion in granting or denying severance, and it is only when that discretion is clearly abused and the defendant prejudiced that constitutional error arises. *United States v. Hutchinson*, 488 F.2d 484 (C.A. 8th Cir. 1973); *United States v. Biondo*, 483 F.2d 635 (C.A. 8th Cir. 1973), cert. denied 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974); *Williams v. United States*, 416 F.2d 1064 (C.A. 8th Cir. 1969). I do not believe that Edward Poindexter was sufficiently prejudiced—if indeed he was prejudiced —to warrant vacating his conviction on this ground. The petitioner's counsel had an opportunity to cross-examine his codefendant, David Rice, when Rice took the stand. Rice did not testify against Edward Poindexter, and no question under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), arises. Likewise, there was no prejudice to the petitioner in admitting the evidence seized from David Rice's home, even though that evidence was inadmissible against David Rice. As previously explained in this memorandum,

Edward Poindexter has no standing to contest the search of David Rice's home, and "evidence illegally obtained from one defendant is not excludable against a co-defendant when the Fourth Amendment rights of the co-defendant have not been violated by the search and seizure." *United States v. Goldenstein,* 456 F.2d 1006, 1012–13 (C.A. 8th Cir. 1972).

Accordingly, no constitutional error was committed in failing to sustain the petitioner's motion for severance.

## VI.

### THE ALLEGEDLY COERCED TESTIMONY OF DUANE PEAK·

The most damaging evidence presented against Edward Poindexter during his state trial was the testimony of Duane Peak. Duane Peak had admitted to placing the bomb at 2865 Ohio Street and had testified that Edward Poindexter was directly responsible for the construction of the bomb. The petitioner now alleges that the testimony of Duane Peak should not have been admitted at trial, because it was coerced and perjured.

It is unquestioned that Duane Peak was frightfully aware of the possibility that he might receive a death sentence for his complicity in the Minard killing, and the Omaha police department undoubtedly mentioned this possibility to Duane Peak. Duane Peak's lawyer, at some time, offered to have Duane Peak assist in the prosecution of David Rice and Edward Poindexter if the County Attorney's office would allow him to plead to a lesser offense than first degree murder. That offer was accepted. At the preliminary hearing before Judge Simon A. Simon on September 28, 1970, Duane Peak first refused to implicate Edward Poindexter in any manner, and then changed his testimony and implicated Poindexter in the killing.

 The above findings of fact do not, however, convince me that Duane Peak's testimony was unconstitutionally coerced or perjured. The petitioner has the burden to show that Duane Peak's testimony was the result of unconstitutional coercion. See *Fugate v. Gaffney,* 453 F.2d 362 (C.A. 8th Cir. 1971), cert. denied 409 U.S. 888, 93 S.Ct. 142, 34 L. Ed.2d 145 (1972); and *Harkins v. Perini,* 419 F.2d 468 (C.A. 6th Cir. 1968). I am not aware of any evidence of any physical mistreatment or unduly preferential treatment of Duane Peak that would lead this court to find that he had been unconstitutionally coerced under the doctrines expressed in *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The fear of a death sentence, the existence of a plea bargain, and the fact that the Omaha police department, while maintaining custody of Duane Peak, supplied him with a comfortable environment and palatable cuisine does not render his testimony inadmissible. His credibility may be questioned, and was at the trial, but I find no constitutional error in allowing his testimony to be heard. It was for the jury to determine whether his testimony was to be believed.

## VII.

### THE ALLEGEDLY INFLAMMATORY PHOTOGRAPH

The petitioner wishes to contest the introduction of a certain "inflammatory" photograph at his state court trial. The picture, not presented in evidence before this court, is assumably one of Officer Minard taken just after the explosion.

 This court ruled on April 17, 1975, that the question of constitutional prejudice in admitting this photograph had not been presented to the Supreme Court of Nebraska and therefore was not exhausted. Reconsidering this issue of exhaustion, I am of the opinion that my prior ruling was correct. The subject was mentioned in only one sentence of the petitioner's pro se brief to the Supreme Court of Nebraska, and I cannot conclude that the issue was properly

presented to that court. I am aware that the Supreme Court of Nebraska has ruled that errors known to petitioners at the time of their direct appeal and which were not presented therein will not *ordinarily* be considered in a post-conviction petition. *State v. Weiland,* 190 Neb. 111, 206 N.W.2d 336 (1973). The issue is not completely foreclosed from such post-conviction relief, however, and the state courts should be first given the opportunity to consider it. It should be obvious, too, that I could scarcely decide the matter without seeing the photograph.

## VIII.

### THE CUMULATIVE EFFECT OF ALLEGED ERRORS

■ The petitioner argues that the cumulative effect of the issues numbered IV, V, VI and VII was such that his right to receive a fair and impartial trial under the Fourteenth Amendment has been violated. I disagree for the same reasons I have stated as to each of the alleged errors.

## IX.

### ALLEGED INSUFFICIENCY OF THE EVIDENCE OF GUILT

■ ■ The petitioner argues that the evidence supporting his state court conviction was generally insufficient. This court agrees with the opinion of the Supreme Court of Nebraska in *State v. Rice,* 188 Neb. 728, 199 N.W.2d 480 (1972), and holds that the testimony of Duane Peak, the membership of the petitioner in the NCCF, and the written article of the petitioner advocating violence against the police was sufficient to pass the constitutional standards expressed in *Vachon v. New Hampshire,* 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974); *Johnson v. Florida,* 391 U.S. 596, 88 S.Ct. 1713, 20 L.Ed.2d 838 (1968); and *Cunha v. Brewer,* 511 F.2d 894 (C.A. 8th Cir. 1975). There was

not a total void of evidentiary support for the petitioner's conviction and the due process clause, therefore, was not violated.