277 Neb. 936
STATE OF NEBRASKA, APPELLEE,
v.
EDWARD POINDEXTER, APPELLANT.
No. S-07-1075.
Supreme Court of Nebraska.
Filed June 19, 2009.
Robert F. Bartle, of Bartle & Geier, Beth Little Hamilton, and John C. Vanderslice, of the Federal Public Defender's Office, for appellant.
Jon Bruning, Attorney General, and James D. Smith for appellee.
Amy A. Miller, for amicus curiae American Civil Liberties Union Foundation of Nebraska.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

I. NATURE OF CASE
Edward Poindexter and David L. Rice were convicted of first degree murder for the death of an Omaha police officer. Poindexter's and Rice's convictions were affirmed on direct appeal.[1] Two petitions for writ of habeas corpus by Poindexter have since been denied.[2] Poindexter now appeals from a denial of his motion for postconviction relief. The motion alleged prosecutorial misconduct at trial, ineffective assistance of trial and appellate counsel, and constitutional error stemming from the unitary procedure used at trial. We find no merit to Poindexter's arguments and affirm the judgment.

II. BACKGROUND

1. TRIAL
Poindexter and Rice were tried in a joint trial before a jury in 1971. The jury considered all of the evidence and determined both guilt and punishment in the same proceeding, in a "unitary trial procedure." The general facts presented at Poindexter's trial were as follows:
On August 17, 1970, a caller to the 911 emergency dispatch service reported hearing a woman or girl screaming for help from a vacant house in Omaha, Nebraska. Several officers, including Officer Larry D. Minard, Sr., responded to the call and entered the house. When Minard inspected a suitcase lying on its side near the doorway, an explosion occurred, killing Minard and injuring other officers in the house.
The suitcase contained a bomb of ammonia dynamite that had been set to explode when moved. The bomb also contained copper wires, pieces of which were apparently blown next door by the force of the explosion.
Duane Peak, age 16 at the time of trial, testified that the bombing was part of a scheme devised by Poindexter and Rice. Peak, Rice, and Poindexter were all members of the National Committee to Combat Fascism (NCCF), an affiliate of the Black Panther party. Poindexter was the head of the NCCF, and Rice was the "Deputy Minister of Information" for the NCCF.
Peak testified that Poindexter and Rice assembled the bomb at Rice's home and that he was operating under their instructions when he planted the suitcase and made the false report to the 911 dispatch. Peak testified that during the call, he made his voice sound deeper than normal.
During cross-examination, Peak was questioned about the fact that his original confession did not implicate Poindexter or Rice and about inconsistencies in his account of events. Peak denied having struck any deal with the prosecution in exchange for his testimony, but he did state that he felt things would go easier for him if he cooperated. Sometime after Poindexter and Rice's trial, Peak pleaded guilty to charges in juvenile court.
No issue was presented to the jury as to whether it had been Peak who made the 911 call, and the tape recording of the call was not entered into evidence. Defense counsel, instead of disputing that Peak was involved with the crime, generally denied that Poindexter and Rice had in any way joined the scheme.
The State presented evidence physically tying Poindexter and Rice to the crime, although the probative value of the evidence was questioned by defense counsel. Expert testimony demonstrated that metal particles found on a pair of long-nosed pliers seized from Rice's house generally matched copper wire found blown next door from the explosion. Other testimony established that toolmarks found on the copper wire matched the pliers found in Rice's basement. Sticks of ammonia dynamite were found in Rice's basement. Ammonia dynamite residue was found in Poindexter's jacket pocket the day he was arrested.
Several NCCF newsletter articles were admitted into evidence over objection from defense counsel. These articles were mostly written by either Poindexter or Rice for the NCCF newsletter and were generally derogatory toward police officers. Many advocated violence against the police force.
The jury found Poindexter and Rice guilty of first degree murder and sentenced them to life imprisonment.

2. DIRECT APPEAL AND HABEAS
Poindexter was represented at trial and on direct appeal by lawyers from the same public defender's office. His conviction was affirmed on direct appeal.[3] Poindexter did not challenge the unitary trial procedure, nor did he raise prosecutorial misconduct on direct appeal.
Among the errors he did assign was the admission into evidence of the NCCF newsletter articles. We held that most of the newsletters, containing expressions of hatred for the Omaha police and advocating the use of violence against them, were properly admitted to show intent, malice, or motive. We concluded that the trial court erred in admitting three of the articles, but we concluded that their admission was not prejudicial. We reasoned that the properly admitted articles were "far more virulent,"[4] that there were relevant cautionary instructions, and that the other properly admitted evidence against Poindexter was relatively strong.
After his direct appeal, Poindexter petitioned for a federal writ of habeas corpus, which was denied after an evidentiary hearing.[5] Among other things, Poindexter's habeas action asserted constitutional error stemming from the newsletter articles, the unitary trial procedure, and the allegedly coerced or perjured testimony of Peak.
The U.S. District Court rejected the idea that the admission of any of the newsletter articles was so prejudicial as to amount to a denial of due process. It also rejected any claim that there was constitutional error stemming from jointly trying Poindexter and Rice.
And the court concluded that there was no evidence of any physical mistreatment or unduly preferential treatment of Peak that would lead to the conclusion that his testimony was unconstitutionally coerced or otherwise inadmissible.[6] The court recognized that Peak was originally unwilling to testify against Poindexter and Rice in the preliminary hearing and that he came back after a break visibly nervous and finally willing to implicate Poindexter and Rice. The court also observed that the police had "undoubtedly" mentioned the possibility of the death penalty to Peak and that the police had generally treated Peak very well prior to trial.[7] But these facts did not show coercion. They were known to defense counsel and instead pertained to Peak's credibility.
In 2006, Poindexter petitioned for a writ of habeas corpus in state court, pertaining to matters not relevant to this appeal. The writ was denied.[8]

3. POSTCONVICTION

(a) Procedural History of Unitary Trial Claim
Poindexter's motion for postconviction relief was filed in 2003. In his original motion, Poindexter raised three basic claims: (1) ineffective assistance of counsel regarding counsel's alleged failure to properly investigate, present exculpatory facts, and cross-examine various witnesses; (2) infringement upon Poindexter's right to a fair and impartial jury, because the jury was instructed to determine Poindexter's guilt and sentence in a unitary proceeding; and (3) prosecutorial misconduct at trial. Central to Poindexter's allegations of prosecutorial misconduct was his claim that the State had concealed the tape recording of the 911 call and that the recording allegedly revealed that it was not Peak who made the call.
In November 2003, the postconviction court denied relief without an evidentiary hearing on Poindexter's allegations concerning the unitary trial proceeding. The postconviction court reasoned that the issue was procedurally barred, because it was known to trial counsel and could have been raised on direct appeal. The court granted Poindexter an evidentiary hearing on the ineffective assistance and prosecutorial misconduct claims.
No appeal was taken from the November 2003 order. Instead, Poindexter filed an amended postconviction motion seeking review of the unitary trial under ineffective assistance and plain error arguments. In July 2005, the court issued an order denying an evidentiary hearing on either of these new characterizations of the unitary trial procedure issue and dismissed these claims. The court explained that the unitary trial procedure of which Poindexter complained had been in effect for 59 years at the time of his trial and that it was not until 1973 that the Nebraska Legislature began to mandate bifurcated proceedings. Poindexter did not appeal from the July 2005 order.
Almost a year later, in June 2006, Poindexter asked the court to reconsider its dismissal of the claims relating to the unitary trial proceedings. The court denied Poindexter's motion for reconsideration, because it was not filed in the same term as the order Poindexter sought to revisit. The court alternatively stated that the merits were properly disposed of in the July 2005 order and that there was no reason to reconsider them. Poindexter did not appeal from the June 2006 denial of his motion to reconsider.
Poindexter filed a second amended petition for postconviction relief after having been granted permission to amend his allegations of ineffective assistance to include the alleged failure to request a copy of the 911 tape. The second amended petition is the operative pleading for this appeal.
As relevant to this appeal, Poindexter alleged that trial counsel was ineffective in failing to (1) effectively cross-examine witnesses Peak, Sgt. Jack Swanson, and Sgt. Robert Pfeffer, (2) inquire into missing police reports of Peak's interrogations, (3) offer evidence to discredit the State's expert testimony identifying dynamite particles on Poindexter's clothing and copper on pliers, and (4) investigate and present evidence concerning the 911 tape recording. He alleged that appellate counsel was ineffective for failing to raise any of the alleged deficiencies of trial counsel.
Poindexter next alleged prosecutorial misconduct in (1) failing to disclose the existence of the 911 tape recording and (2) failing to disclose promises of leniency or threats of prosecution made to Peak in return for his testimony.
Poindexter also continued to allege that his right to a fair and impartial jury was violated by virtue of the unitary trial procedure and that his right to effective assistance of counsel was violated when counsel failed to request a bifurcated trial or argue this issue as plain error on appeal. The court did not, however, reconsider its prior rulings regarding the unitary trial procedure, noting that those allegations had been dismissed by written order in July 2005.

(b) Evidence Presented at Postconviction Hearing
The court considered the record of the original trial, along with the record of Rice's postconviction proceedings, introduced into evidence at Poindexter's evidentiary hearing. Rice had raised allegations concerning the 911 tape and promises or threats to Peak, similar to Poindexter's.[9] We held that Rice had failed to prove those claims. But Poindexter submitted further depositions and testimony in the hope that he would be successful where Rice had not. Poindexter particularly relied on the fact that, unlike Rice, he was able to obtain a voice exemplar from Peak and an expert opinion that the voice on the 911 tape did not belong to Peak.

(i) 911 Tape
It was undisputed that a copy of the 911 tape had resurfaced by 1980, but the parties disputed whether Poindexter's counsel had been aware of the tape recording prior to trial. Poindexter asserted that the State had failed to disclose the tape.
The depositions of coprosecutor Samuel W. Cooper were admitted into evidence. Cooper testified that defense counsel was aware of a 911 tape before trial and that the tape had always been available to defense counsel if they wanted to examine or copy it. Cooper had testified at Rice's hearing that he played the tape for both defense counsel prior to trial.
Cooper testified that there was no reason for anyone to question that it was Peak's voice on the tape. Peak admitted that he had made the call. In addition, although Peak testified that he tried to disguise his voice when he made the call, several witnesses who knew Peak well, including Peak's brother and grandfather, had positively identified Peak's voice on the tape. No one ever came forward asserting that it was not Peak's voice. Cooper stated that Poindexter's counsel was well aware of the witnesses' identifications of Peak's voice.
Thomas Kenney and Frank Morrison were the public defenders representing Poindexter. Both Kenney and Morrison were deceased by the time of Poindexter's postconviction evidentiary hearing. During Kenney's opening statement at Poindexter's trial, Kenney had referred to the fact that "the police have a Voicegram; in other words, every call that is placed to the emergency number at the police station is recorded." It is unclear what Kenney meant by a "Voicegram," and when Poindexter deposed Kenney in 2004, he did not ask him any questions about his knowledge of a 911 tape.
Poindexter testified that he had no knowledge of the tape until he saw a documentary in the 1990's making reference to it. Poindexter deposed Morrison in 2003, when Morrison was 98 years old. Morrison testified that he did not think he had been aware of a 911 tape recording during the time of Poindexter's trial. Cocounsel for Rice, David Herzog, testified at the postconviction hearing that he was sure he had never been made aware of the existence of a 911 tape. And Herzog believed that a "Voicegram" referred simply to a time and date stamp for the 911 call.
Poindexter introduced a copy of internal Federal Bureau of Investigation (FBI) communications indicating that the Omaha police had originally asked the FBI to conduct a voice analysis of the taped 911 call; Poindexter was apparently attempting to show that the prosecution knew the tape was exculpatory. The request for the analysis had been made on the day of the murder and reflects that a copy of the tape was sent to the FBI at that time. The letter demonstrates that the plan was for the FBI to conduct an analysis of the tape and then compare it to tape recordings of suspects. The FBI informed the police that the analysis would be "strictly informal," "for lead purposes only," and that "the FBI could not provide any testimony in the matter." A later communication submitted into evidence by Poindexter reads in part:
Assistant [chief of police] GLENN GATES, Omaha PD, advised that he feels that any use of tapes of this call might be prejudicial to the police murder trial against two accomplices of PEAK and, therefore, has advised that he wishes no use of this tape until after the murder trials . . . has [sic] been completed.
Cooper explained the context of the correspondence with the FBI. He testified that at the time of Poindexter's trial, voice print analysis was in its infancy and was not considered admissible in court. For that reason, any analysis would be for lead purposes only. Cooper explained that the request for a voice analysis was withdrawn as soon as it became clear that there was no real issue as to whose voice was on the tape. Cooper specifically denied that the request for a voice analysis was withdrawn for fear that it was not Peak who made the call. Cooper explained that once Peak was arrested and he and other witnesses said he made the call, there was no genuine argument that it was not Peak's voice on the tape. As such, the prosecution did not see any benefit in opening the door to a battle of experts and withdrew the request for a voice analysis from the FBI.
Lt. James Perry, the head of the investigation for the Minard slaying, testified in a 1980 deposition that he was unaware of any request to have the tape tested but that he recalled discussion of the possibility before the police department knew who had made the call. Perry testified that once Peak admitted to making the 911 call, the department considered the tape of that call a relatively worthless piece of evidence.
Poindexter attempted to show that the tape was not so worthless. Poindexter located Peak and obtained a voice exemplar as part of the discovery process in his postconviction proceeding. He then employed Thomas Owen, a forensic consultant, to conduct a comparative voice analysis of the tape. Although the original 911 tape had been destroyed, Owen used a copy of the original. The postconviction court had allowed the copy into evidence, but noted that it was uncertain at what time and with what equipment the copy was made, whether it was in the same condition as when it was made, and whether the equipment from which it was made was capable of reproducing an accurate voice tone or quality. These facts, the court explained, bore on the relevance and probative value of the tape, but not its authenticity and admissibility.
Based on the examination of a digital spectrogram, Owen opined that it was "highly probable within a reasonable degree of scientific certainty" that the voice on the tape was not Peak's. Digital spectrograms were not available at the time of Poindexter's trial. Nevertheless, Owen explained that the analog spectrogram that would have been available in 1971 had the same information as the digital spectrogram, only without the clarity and ability to qualify and quantify various numbers related to the placement of the formats on them. Both methods, according to Owen, show a visual comparison of the spectrograms, and under both methods, an examiner listens to the tapes and notes pitch, quality of speech, rate of speech, amplitude, and syllable coupling. Owen also opined that the 911 caller did not disguise his voice when he made the call. Poindexter and Herzog both testified they were familiar with Peak's voice and that the voice on the 911 tape was not Peak's. The State did not employ expert analysis of the tape.

(ii) Leniency or Threats to Peak
Donald Knowles, the county attorney at the time of Poindexter's trial, testified at Rice's postconviction hearing that Peak was still under the charge of first degree murder at the time of Poindexter's trial. Knowles testified that while Peak's attorney may have "broached the subject" of the possibility of a plea in juvenile proceedings prior to his testimony in Poindexter's trial, Knowles made "no commitment" and "didn't really comment on it, no discussions as such back and forth." Knowles stated that to his knowledge, neither he nor anyone else made any promises to Peak concerning the ultimate charges against him. Knowles testified that a plea bargain was never struck and that the decision to prosecute Peak as a juvenile took place sometime after Poindexter's trial.
Knowles was also questioned about the fact that Peak had originally refused to implicate Poindexter at the preliminary hearing. Knowles remembered that the preliminary hearing was in a very small room that was filled with a lot of people. He stated that he did not have any discussions with Peak's attorney during the recess. Knowles said that Peak's attorney might have said something to him at the door of the courtroom, but that he did not recall.
Arthur O'Leary was the special prosecutor working under the direction of Knowles in 1971. O'Leary similarly testified at the Rice hearing that there had been no promises of leniency made to Peak in exchange for his testimony. O'Leary explained that when Peak's attorney had asked him what he would do for Peak, he replied that he "would do whatever I could to help him if he cooperated with us." O'Leary stated he did not have the authority to enter into a plea bargain agreement and so Peak's attorney "knew better than to ask specifically and I knew better than to answer specifically." O'Leary also stated that a deal would not have been entered into without his knowledge and that, to his knowledge, no deal had been made.
O'Leary generally testified that the county attorney's office and the police fully disclosed any evidence pertaining to the case, including police reports and physical evidence. O'Leary testified: "We never tried to make a game out of a criminal case." Cooper testified that he was privy to all the police reports in the case and that to his knowledge, the State had not struck any deal with Peak prior to trial in exchange for his testimony.
Kenney testified that he and Herzog had suspected a deal and "tried everything we could think of to uncover if there was a deal" between Peak and the prosecution. Kenney testified, however, that the prosecution and Peak always denied that there was a deal and that he was never able to establish that there was one. Kenney noted that "it was no secret" that the police had taken Peak to eat in "a fancy restaurant at the airport" at least one time, allegedly as part of keeping Peak isolated from other prisoners, including Poindexter and Rice.

(iii) Pliers and Dynamite
Poindexter presented expert testimony at the postconviction hearing pertaining to the dynamite residue and the copper found next door in an effort to show that his trial counsel was ineffective in failing to pursue its own expert testimony at trial. Robert Webb, an expert in materials analysis, testified at the postconviction hearing that the testimony presented by the prosecution's experts on these points was very general. In particular, the prosecution's experts identified the dynamite on Poindexter's clothing and the dynamite from the bomb as belonging to the most general category of ammonia dynamite. The experts did not analyze the more specific forms of dynamite and whether those matched.
Morrison testified as to why experts were not employed to refute the prosecution's case. Morrison testified that they suspected someone had planted the dynamite residue in Poindexter's pocket and that they were afraid it might in fact match the more specific subcategory of dynamite. Morrison stated that if "we had done a scientific analysis and prove[d] that it was the same explosive that was used it would've been the nail in Poindexter's coffin."
Kenney elaborated that they were well aware that the prosecution's testimony regarding the dynamite match was very general. The cross-examination of the State's witnesses reflects this. Kenney noted he was more concerned at that time with the fact that the tool markings on the copper wire matched the pliers found in Rice's basement.

(c) District Court's Order
The court denied Poindexter's motion for postconviction relief. The court found that Poindexter had failed to prove the existence of any deal between the prosecution and Peak in exchange for Peak's testimony. As for the 911 tape, the district court concluded that Poindexter's counsel knew of the tape and did not specifically request a copy of the tape and that the tape was not considered exculpatory evidence. The court also noted that Poindexter had failed to show that Owen's opinion, had it been presented at the 1971 trial, would have changed the result. The court found that trial counsel were not ineffective in their investigation or their cross-examination of Peak or the State's experts. As a necessary result of these findings, the court concluded that appellate counsel was not ineffective for failing to raise these issues on direct appeal.

III. ASSIGNMENTS OF ERROR
Poindexter asserts that the district court erred in (1) failing to find that the unitary trial procedure in place in 1971 was "plain structural error"; (2) failing to find that Poindexter's trial and appellate counsel were ineffective in failing to challenge the unitary trial process, failing to present and preserve critical evidence, and failing to effectively rebut prosecutorial evidence; and (3) not giving appropriate weight to significant instances of prosecutorial misconduct.

IV. STANDARD OF REVIEW
[1] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law.[10]
[2] On appeal from a proceeding for postconviction relief, the lower court's findings of fact will be upheld unless such findings are clearly erroneous.[11]

V. ANALYSIS

1. UNITARY TRIAL PROCEDURE AND NEWSLETTER ARTICLES
We first address Poindexter's assignments of error pertaining to the unitary trial procedure. Poindexter asserts that the unitary trial caused the jury to be exposed to inflammatory newsletter articles that should have been appropriate only for sentencing. Although we specifically determined on direct appeal that there was no prejudicial error derived from the admission of the newsletters, Poindexter believes this holding is no longer valid when considered in the context of a unitary trial challenge and the newly discovered evidence pertaining to the 911 tape. Poindexter also argues that the unitary trial procedure forced trial counsel into a conflict by having to argue innocence and mercy for sentencing at the same time. Poindexter asserts that although counsel did not preserve the alleged error at trial or on appeal, we should recognize it now as plain error. Alternatively, Poindexter alleges ineffective assistance of counsel in failing to object to the unitary trial procedure during trial or on appeal.
[3, 4] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[12] It is clear that we have no jurisdiction over any of Poindexter's unitary trial claims. Poindexter failed to appeal from the postconviction court's determination in November 2003 that Poindexter's unitary trial claims were procedurally barred. Poindexter again failed to appeal from the postconviction court's determination in July 2005 that Poindexter's plain error and ineffective assistance characterizations of his unitary trial claim lacked merit. Failure to timely appeal from a final order prevents our exercise of jurisdiction over the claim disposed of in the order.[13]
[5,6] An order granting an evidentiary hearing on some issues presented in a postconviction motion but denying a hearing on others is a final order.[14] Such an order affects a substantial right in a special proceeding and is thus final and appealable under Neb. Rev. Stat. § 25-1902 (Reissue 2008).[15] In addition, an order denying an evidentiary hearing on a postconviction claim is a final judgment as to such claim under Neb. Rev. Stat. § 29-3002 (Reissue 2008).[16]
Poindexter asserts that his postconviction motion presented multiple "claim[s] for relief" and that thus, the November 2003 and July 2005 denials of his unitary trial "claim[s] for relief" cannot be final, appealable orders pursuant to Neb. Rev. Stat. § 25-1315 (Reissue 2008). We have already addressed and rejected this argument in State v. Harris.[17] A "claim for relief" under § 25-1315 is not synonymous with an "issue" or "theory of recovery," but, rather, is equivalent to a separate "cause of action."[18] A postconviction motion presents a single cause of action, and the various facts alleged as evidence that the defendant is entitled to postconviction relief are but multiple theories of recovery.[19] We have no jurisdiction over Poindexter's unitary trial theories of recovery, which were disposed of during the postconviction proceedings long before the final judgment currently before us.

2. 911 TAPE
We next consider Poindexter's assignments of error regarding the 911 tape. Poindexter argues that it was prosecutorial misconduct for the State to fail to inform him of the 911 tape. Alternatively, Poindexter asserts that it was ineffective assistance of trial counsel to fail to obtain the tape and use it at trial to impeach Peak's testimony that he had made the 911 call.
The district court found that the State did not, deliberately or negligently, withhold the 911 tape from Poindexter. In other words, regardless of whether the tape was exculpatory, requiring the prosecution to disclose the tape, the court concluded that it actually had been disclosed. The district court did not clearly err in making this finding. Cooper testified on at least two separate occasions that Poindexter's counsel was aware of the tape and that Cooper had even played it for them. Knowles generally denied hiding any evidence from defense counsel. Poindexter never questioned his lead counsel on the subject, despite his having made a reference to a "Voicegram" at trial, and cocounsel Morrison's testimony seemed not entirely certain.
[9] While Rice's cocounsel stated emphatically that he was unaware of a 911 tape, his testimony is not directly probative of what Poindexter's counsel knew. More importantly, issues of credibility are for the postconviction court.[20] Because the tape was disclosed, we agree with the district court's conclusion that there was no prosecutorial misconduct concerning the tape, and we need not discuss the district court's alternative reasons for this conclusion.
[10] We also agree with the district court that Poindexter's trial counsel was not ineffective for failing to pursue voice analysis of the tape to prove that Peak was not the caller. A defendant claiming ineffective assistance of counsel must show that counsel's representation fell below an objective standard of reasonableness.[21] There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions.[22]
[11] The district court specifically found that defense counsel knew that several witnesses had identified the voice on the tape to be Peak's. Given Peak's admission and several witness identifications of his voice on the tape, it was not unreasonable for counsel to assume the voice was Peak's. Moreover, defense counsel's strategy was not to exculpate Peak as the 911 caller and thus argue that Peak had falsely admitted to leading an officer to his death in an effort to save himself or others from conviction of a more serious crime. Instead, the defense theory appeared to be that Peak did not act alone, but that Poindexter and Rice were not the ones who helped him. Even assuming that Owen's opinion is correct and that the technology available in 1971 could have produced a similar result, that information does not make Poindexter's trial counsel ineffective for failing to pursue such an analysis. This is especially true when, as the State points out, expert voice identification evidence was generally considered inadmissible at the time of Poindexter's trial.[23] The ineffectiveness of counsel will not be judged by hindsight.[24]

3. MISSING INTERROGATIONS AND PROMISES OF LENIENCY
Similar to his allegations regarding the 911 tape, Poindexter alleged the State failed to disclose certain interrogations of Peak and an arrangement that had been made in exchange for Peak's testimony. Alternatively, Poindexter alleged that trial counsel was ineffective in failing to adequately investigate these matters. The district court found that Poindexter failed to prove that any undisclosed interrogations actually took place or that any undisclosed deal was struck. We agree with the district court's conclusions.
Poindexter's evidence on this subject consists almost entirely of inferences he makes upon the trial record. Poindexter infers that undisclosed interrogations must have taken place, because Peak changed his story between his August 28 and 31, 1970, interrogations. He also claims that Peak made reference during the preliminary hearing to his being interrogated at times not reflected by the police reports turned over to the defense, although Poindexter admits that Peak's testimony was "somewhat confusing."[25] Poindexter infers that a plea bargain agreement was entered into before trial, because Peak received special treatment while in custody and ultimately ended up serving a lenient sentence as a juvenile. Poindexter also infers such an agreement from Peak's behavior at the preliminary hearing.
With regard to the preliminary hearing, Peak admitted that he had "a conversation" with his attorney that indicated that he "didn't have a chance." But he specifically denied having a conversation with the prosecution. When asked to explain what he was afraid of, Peak stated that twice during his original interrogations with police officers, they had mentioned the electric chair. Specifically, the officers had told him he "was sitting in the electric chair so [he] had better tell the truth."
Any new evidence presented at the postconviction evidentiary hearing on whether a deal was struck or coerced was unfavorable to Poindexter's claim. Knowles, O'Leary, and Cooper all testified that there were no promises of leniency in exchange for Peak's testimony and that there was no agreement whatsoever. As for threats, O'Leary specifically denied ever threatening anyone with the electric chair.
Because Poindexter failed to prove the alleged agreement took place, the postconviction court properly concluded that no prosecutorial misconduct or ineffective assistance of counsel claims arose from the failure to disclose or to investigate it.

4. PLIERS MARKINGS AND DYNAMITE RESIDUE
Poindexter challenges the postconviction court's determination that trial counsel was not ineffective in failing to present expert testimony challenging the State's evidence of dynamite found in Poindexter's pocket and copper remnants found in pliers found in Rice's home.
At trial, the prosecution's expert, Kenneth Snow, testified that the particles found in Poindexter's jacket pocket were ammonia dynamite, the same general type of dynamite as used in the bomb. Expert testimony was also presented that copper residue in pliers found in Rice's basement was of the same general composition as the copper wire found in the basement of an abandoned house next door to the bombing. At the postconviction hearing, Webb, the materials analysis expert for Poindexter, testified that the expert testimony as to the matching dynamite residue and the copper was very general. Webb noted particularly that there were scientific methods available at that time that could have identified what subcategory the ammonia dynamite belonged to.
The record supports the district court's conclusions that the failure to retain independent expert witnesses was a matter of trial strategy and that defense counsel were not deficient in their performance. Not only could further investigation have produced an unfavorable result, as was explained by Morrison, but it is clear that expert witnesses were not necessary for Poindexter's defense counsel to illustrate for the jury the inadequacies of the prosecution's expert testimony. The cross-examination of Snow, for instance, spanned 2 days. Defense counsel focused on the fact that dynamite was found only in one pocket of Poindexter's jacket and that not even the "minutest particle" of dynamite was found anywhere else on Poindexter's body or clothing. Even swabs under Poindexter's fingernails found no traces of dynamite.
Most of the cross-examination focused on illustrating for the jury how general the "matches" really were. Counsel questioned Snow about how broad a category "ammonia dynamite" was, and Snow admitted that ammonia dynamite was the most common type of dynamite available to the general public and best for all-around general use. Snow specifically admitted that it was unknown whether the dynamite residue found in Poindexter's pocket was from the dynamite used for the bomb or from some other ammonia dynamite used for some other purpose. Snow conceded that his analysis did not identify whether the dynamite residue in Poindexter's pocket was the same brand of dynamite used in the bomb.
Snow also conceded that he did not know whether the dynamite residue had been deposited in the pocket recently or several months before. And he admitted he had no idea how the dynamite particles got into Poindexter's pocket. Snow testified that the small amounts of dynamite found in Poindexter's pocket could have been deposited there by a handkerchief, a pencil, or package of cigarettes that had touched ammonia dynamite and contained some residue.
Cross-examination of Snow regarding the copper particles on the pliers was conducted in a similar vein. Snow admitted that copper wire was very common and that his analysis did not show the copper remnants on the pliers were from the same wire used in the bomb. All Snow could say was that the wire used in the bomb was copper wire and that the pliers found in Rice's basement had copper residue on them. Snow admitted that copper was a common element and that there was nothing remarkable to distinguish the copper found on the pliers "from other copper that exists in mankind." Snow further admitted it was reasonably probable that the pliers had been used to cut some other common copper wire found at any electric store.
We agree with the district court's conclusion that Poindexter was not deprived of effective assistance of counsel on this issue.

5. SWANSON'S AND PFEFFER'S TESTIMONY
Poindexter alleges that trial counsel was ineffective, because counsel inadequately cross-examined Swanson and Pfeffer about where and how they found the dynamite in Rice's home. The district court found no merit to Poindexter's allegations in this regard, which the court stated were tied to Poindexter's implied, but unsubstantiated, accusation that the officers had planted the dynamite in Rice's home. The district court stated further that it may have been that defense counsel did not pursue the inconsistencies as a matter of trial strategy "rather than hammer home to the jury that dynamite was found in Rice's house." We find no merit to Poindexter's assertion that he was deprived of effective assistance of counsel because of the manner in which Swanson and Pfeffer were cross-examined.
At trial, Swanson testified that he found dynamite in Rice's basement and that Pfeffer was also in the basement when the dynamite was found. Pfeffer, on the other hand, testified at trial that he never went to the basement and that he did not see the dynamite until Swanson carried it up from the basement. Trial counsel did not spend time exploring who was really in the basement when the dynamite was found, and this was reasonable given that the particulars of who found the dynamite and who was with that person at the time are relatively insignificant.

6. PEAK
Finally, Poindexter asserts that trial counsel was ineffective in the cross-examination of Peak. Poindexter admits that trial counsel confronted Peak with the inconsistencies in his version of the events leading up to Minard's death. But Poindexter asserts his constitutional right to effective assistance of counsel was violated, because the confrontation did not go far enough and counsel should have more forcefully asked leading questions to emphasize the impossibility of all the various claims made by Peak. We find no error in the district court's conclusion that Peak was adequately cross-examined.
The court noted that Peak was a "boy who had never been in a courtroom before" and that the jury might not have looked favorably upon a more vigorous cross-examination. But, in fact, we observe from the record that the cross-examination of Peak was quite extensive. The cross-examination of Peak by Poindexter's and Rice's trial counsel spanned over 100 pages in the bill of exceptions. Peak was questioned about the fact that in his original confession to the police on August 28, 1970, neither Poindexter nor Rice was implicated. Peak was questioned about the fact that he had originally said that an anonymous letter had directed him to leave the suitcase in an alley and to wait in a telephone booth where an unknown woman called him and told him to call the police. Defense counsel pointed out in detail how, when Peak finally made a statement implicating Poindexter and Rice, the details of that account were significantly different from those testified to at trial, and how, in the preliminary hearing, he originally refused to testify against Poindexter and Rice.
Peak was also questioned regarding his motivation for his testimony against Poindexter. Peak admitted to the jury that in his interrogations, the police mentioned the possibility of his being sentenced to death and that he was scared. Peak also admitted that after implicating Poindexter and Rice, he was treated very well by the police and had been taken on outings to restaurants for dinner and to visit family. He admitted that his attorney had told him there was a possibility he would be allowed to plead to a lesser offense than the first degree murder he was charged with. Reviewing the trial record in this case, we determine there were clearly no constitutional deficiencies in defense counsel's cross-examination of Peak.

VI. CONCLUSION
For all the reasons stated above, we affirm the judgment of the district court denying Poindexter's motion for postconviction relief.
AFFIRMED.
NOTES
[1] State v. Rice, 188 Neb. 728, 199 N.W.2d 480 (1972).
[2] Poindexter v. Wolff, 403 F. Supp. 723 (D. Neb. 1975); Poindexter v. Houston, 275 Neb. 863, 750 N.W.2d 688 (2008).
[3] State v. Rice, supra note 1.
[4] Id. at 751, 199 N.W.2d at 494.
[5] Poindexter v. Wolff, supra note 2.
[6] See id.
[7] Id. at 733.
[8] Poindexter v. Houston, supra note 2.
[9] See State v. Rice, 214 Neb. 518, 335 N.W.2d 269 (1983).
[10] State v. Sims, ante p. 192, 761 N.W.2d 527 (2009).
[11] State v. Watkins, ante p. 428, 762 N.W.2d 589 (2009).
[12] State v. Smith, 269 Neb. 773, 696 N.W.2d 871 (2005).
[13] See, e.g., In re Interest of B.M.H., 233 Neb. 524, 446 N.W.2d 222 (1989).
[14] See State v. Harris, 267 Neb. 771, 677 N.W.2d 147 (2004). See, also, State v. Hudson, 273 Neb. 42, 727 N.W.2d 219 (2007); State v. Jackson, 15 Neb. App. 523, 730 N.W.2d 827 (2007).
[15] See State v. Silvers, 255 Neb. 702, 587 N.W.2d 325 (1998).
[16] State v. Hudson, supra note 14.
[17] State v. Harris, supra note 14.
[18] See id. See, also, State v. Hudson, supra note 14; Bailey v. Lund-Ross Constructors Co., 265 Neb. 539, 657 N.W.2d 916 (2003); Keef v. State, 262 Neb. 622, 634 N.W.2d 751 (2001); Pioneer Chem. Co. v. City of North Platte, 12 Neb. App. 720, 685 N.W.2d 505 (2004).
[19] See id.
[20] See, e.g., State v. McDermott, 267 Neb. 761, 677 N.W.2d 156 (2004).
[21] See State v. Wagner, 271 Neb. 253, 710 N.W.2d 627 (2006).
[22] See State v. Rhodes, ante p. 316, 761 N.W.2d 907 (2009).
[23] See, United States v. McDaniel, 538 F.2d 408 (D.C. Cir. 1976); State v. Gortarez, 141 Ariz. 254, 686 P.2d 1224 (1984); People v. Kelly, 17 Cal. 3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976) (superseded by statute as stated in People v. Wilkinson, 33 Cal. 4th 821, 94 P.3d 551, 16 Cal. Rptr. 3d 420 (2004)); Cornett v. State, 450 N.E.2d 498 (Ind. 1983); Reed v. State, 283 Md. 374, 391 A.2d 364 (1978); People v Tobey, 401 Mich. 141, 257 N.W.2d 537 (1977); Commonwealth v. Topa, 471 Pa. 223, 369 A.2d 1277 (1977); State v. Free, 493 So. 2d 781 (La. App. 1986); People v. Collins, 94 Misc. 2d 704, 405 N.Y.S.2d 365 (1978). See, also, Sharon E. Gregory, Voice Spectrography Evidence: Approaches to Admissibility, 20 U. Rich. L. Rev. 357 (1986).
[24] State v. Wickline, 241 Neb. 488, 488 N.W.2d 581 (1992).
[25] Brief for appellant at 42.